No. 17,793.

FRANCISCO ARCHINA *v*. PEOPLE OF THE STATE OF COLORADO.

(307 P. [2d] 1083)

Decided February 27, 1957.

Mr. ANTHONY F. ZARLENGO, Mr. WILLIAM L. RICE, Mr. FELIX D. LEPORE, for plaintiff in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK E. HICKEY, Deputy, Mr. NORMAN H. COMSTOCK, Assistant, for defendant in error.

*En Banc.*

MR. JUSTICE HALL delivered the opinion of the Court.

FRANCISCO ARCHINA, plaintiff in error herein, to whom we shall refer as defendant and at times as Frank Archina, by information filed in the District Court of the City and County of Denver on January 28, 1954, was charged with the murder of Elizabeth Macri. Being arraigned on March 29, 1954, the defendant entered two pleas:

(a) Not guilty.

(b) Not guilty by reason of insanity at the time of the alleged commission of the offense.

The case was then continued to August 23, 1954, for trial. On entry of the plea of not guilty by reason of insanity, defendant was ordered committed to the psychopathic ward of the State Hospital at Pueblo, Colorado, for observation and examination as to his sanity; said commitment being for a period not exceeding twenty days which period was, by order of Court, extended for an additional thirty days. The observation and examination of defendant was completed May 26, 1954, and a written report made to the Court by the Colorado State Hospital which expressed the opinion that the defendant was sane at the time of the alleged commission of the crime.

On August 13, 1954, the district attorney filed notice of intent to take the deposition of *Edward S.* Johnson, *whose address is Denver General Hospital.* The witness appeared as required by subpoena issued and served in Denver, August 19, 1954. On August 23, 1954, the deposition of *Dr. Edwin S. Johnson,* a witness in behalf of the People, was taken. Selection of a jury to try the case on the not guilty plea was commenced on Augsut 23, 1954. Prior to the taking of the Johnson deposition, there was considerable argument over the propriety of taking the deposition at that time and over the question as to whether the witness could be present when needed, probably August 26, 1954. Out of this argument and

discussion and the testimony of Dr. Johnson, it appeared that he would not be able to appear as a witness as late as August 24, 1954, for the reason that he had been called to active duty with the Air Force for overseas duty in Germany and was then under orders to report at Gunter Air Force Base, Montgomery, Alabama, on August 30, 1954; he stated that he intended to drive his car to Alabama and to take the same with him overseas; that in order to reach his station by August 30, 1954, he would have to leave Denver August 26, 1954; that he could not stay over and fly to Alabama for he had no way to get his car there; that for the present his wife was to stay with her folks in Wichita:

"She will not be able to go over with me until several months have elapsed."

For reasons that have no bearing on the issues now before this Court, a mistrial was declared on August 26, 1954. The Johnson deposition was not offered at that trial.

On January 11, 1955, an order was entered setting the case for trial on March 7, 1955. On February 9, 1955, the district attorney filed with the clerk of the court praecipe for subpoena for:

"All witnesses endorsed on the information * * * returnable March 7, 1955, at 9:30 A.M."

Among the witnesses endorsed on the information is:
*Dr. Johnson — Denver General Hospital.*

Pursuant to said praecipe, subpoena was issued by the clerk on February 10, 1955, whereby the sheriff was commanded to serve the same upon, among others:
*Dr. Johnson — Denver General Hospital.*

The sheriff made return on the subpoena showing service on three witnesses (not Dr. Johnson) and stated in writing on the subpoena:

"After diligent search; I have been unable to find the within named Dr. Johnson."

Signed: George Hayes.

"This doctor is in the army service — not available."

On March 10, 1955, being the fourth day of the trial, the district attorney requested the court to ask the bailiff if *Dr. Edward S. Johnson* is available for testimony.

The Court, addressing the bailiff, said:

"Well, you inquire as to whether or not Dr. Edward S. Johnson is among those witnesses out there or anywhere in that hallway."

Whereupon, the bailiff left the court room and returned shortly thereafter. On his return, the Court said:

"Is Dr. Johnson out there, Mr. Bailiff?" The bailiff answered: "He is nowhere there."

The district attorney then stated that the court record should show:

"That the witness, Dr. Edward S. Johnson, was not able to be obtained."

The district attorney then offered in evidence the deposition of Dr. Edward S. Johnson.

Defendant's counsel objected to the admission of the deposition until the district attorney show that the doctor was not available. The district attorney stated that he was then ready to make a showing that Dr. Johnson was not available and, to that end, in the absence of the jury, called as a witness, George Hayes, deputy sheriff, who testified that about twenty days previously he had made an effort to serve a subpoena on Dr. Edward S. Johnson of the Denver General Hospital, that he was unable to make service and made the return set forth above. In answer to questions as to what he did in his efforts to make service, he stated:

(a) I made inquiry in the coroner's office and was told he was in the Armed Forces.

(b) I proceeded to the emergency ambulance crew and received the same reply — that he was in the Armed Service of the United States.

(c) I proceeded to the business office or personnel office, of the Denver General Hospital, where I inquired and received the same answer there, and also by the telephone operator.

On cross examination, the witness stated that he asked only for Dr. Johnson as shown on the subpoena and never asked for a Dr. Edward S. Johnson, that he made no inquiry except as outlined above, he never made inquiry at Lowry Field, Denver, at Rocky Mountain arsenal, made no inquiry as to where Dr. Johnson resided, that he has no information as to the whereabouts of Dr. Edward S. Johnson other than what several people at the Denver General Hospital told him concerning a *Dr. Johnson.*

The court admitted the deposition in evidence and in doing so said:

"I believe there has been a definite showing, and not on the deposition alone, that Dr. Edward S. Johnson who is a witness in this matter was called to the Armed Services and has proceeded under orders to report. Where he is at this time is unknown to this Court, counsel on either side, and the Sheriff's office. The Court will admit this exhibit subject to the objections made by counsel for the defense as to any portion thereof at which time the rulings will be made."

The evidence produced at the trial on the not guilty plea stands without contradiction. Defendant did not testify and offered no testimony.

The record shows that the defendant, age 22 years at the time of trial, had been born and raised and resided in Italy until some time shortly prior to December 1952, when he and his brother, Luigi Archina, arrived in the United States, whereupon they proceeded to Denver and took up their residence with the Frank Macri family consisting of Frank Macri, Sr., his wife, Elizabeth Macri, his sons, Steve Macri and Frank Macri, and daughters, Rose Macri Archina, wife of the defendant, and Mary Macri Archina, wife of Luigi Archina. The residence was located at 3949 Tejon Street, Denver, Colorado.

On Sunday, January 24, 1954, all of the Macri family and the Archina boys had their noon meal together at 3949 Tejon Street. Following the noon meal, Frank

Macri, Sr., Frank Macri, Jr., Luigi Archina and the defendant, Frank Archina, all went out in front of the house; Steve, at the same time, went to the rear of the house to wash his car; Rose, Mary and Elizabeth remained in the kitchen clearing the table and washing the dishes. Shortly after the four went out in front of the house they all returned, coming in the front door. As they entered the house, Rose, who was in the kitchen, heard her father and brother arguing with the Archina brothers in the living room; the only words she heard were from defendant: "You don't know how to teach children." To which Frank Macri, Sr., answered: "I know, because I was born before you."

Thereupon, defendant threw Frank Macri, Sr., to the floor, the three women went to the living room, Elizabeth Macri was standing in the middle of the doorway leading upstairs when defendant started upstairs and threw Elizabeth to the floor and he and his brother, Luigi, went upstairs. Frank Macri, Sr., Elizabeth Macri, Frank Macri, Jr., Rose Macri Archina and Mary Macri Archina all went into the bedroom. Frank Macri, Sr., took a double barrel shotgun from behind a dresser in the bedroom, Rose went out back to call her brother, Steve, and she and Steve re-entered the house and went into the bedroom where Steve Macri saw his father, Frank Macri, Sr., with a double barrel twelve-gauge shotgun in his hand and at the dresser searching for shells, whereupon Steve Macri went out to call the police.

Rose, Mary and Elizabeth went inside the clothes closet in the bedroom and closed the door, Frank Macri, Sr., and Frank Macri, Jr., were in the bedroom; shortly, Rose heard a shot, then another, then heard screaming. The door of the closet was opened by defendant who held a double barrel shotgun which he loaded and fired twice into the head of Elizabeth Macri killing her. Elizabeth, at the time she was killed, was kneeling in the closet, "asking pity and grace for him not to shoot."

The defendant then took out the empty shells, reloaded the gun and fired two shots into the body of Mary inflicting wounds resulting in her death on February 10, 1954; the defendant then took out the empty shells, again loaded the gun and tried to shoot Rose by placing the gun against her neck. She heard "a click" from the gun — it did not fire. The defendant went under the bed for a moment, then jumped through a window breaking it and fled down the alley. About one hour and a half later, he was discovered at a nearby tavern and placed under arrest.

After the shooting, Rose jumped through the window through which the defendant had made his exit and ran to a neighbor's house in the rear; the neighbor, Joann Swobada, testified:

"She was rather wild looking and she had no shoes on and her legs were bloody and she was quite hysterical — she kept crying, "My mama's dead.""

She further testified that she and Rose went inside Joann Swobada's house and that afternoon, exact time not fixed, she heard Rose say: "My husband is dead. My husband did it."

Shortly after the shooting, Luigi Archina was found lying in the alley back of 3949 Tejon Street, unconscious, semi-conscious or feigning unconsciousness, apparently uninjured. He was removed by ambulance. The record is strangely silent as to Luigi Archina's doings and whereabouts from the time he went upstairs with the defendant until he was found in the alley and removed by ambulance and thereafter.

A few minutes after the shooting, Steve and Rose returned to the house; shortly thereafter, neighbors and others, including numerous police officers, arrived and found the body of Frank Macri, Sr., lying on its back with a shotgun under the right arm in the hallway to the bedroom; the body of Elizabeth Macri in the closet; Frank, Macri, Jr., was lying in the living room suffering from gunshot wounds from which he died the following

day; Mary Macri Archina was found in the bedroom suffering from gunshot wounds from which she died February 10, 1954. Police took pictures of the inside of the house showing the positions of the two dead bodies and two pictures of each body in the house were introduced in evidence. Also, the deposition of Dr. Johnson, taken August 23, 1954, was admitted in evidence. In his deposition, Dr. Johnson testified that he performed an autopsy upon the body of Elizabeth Macri at the morgue in the City of Denver on January 25, 1954; he identified two pictures (People's Exhibits D and E) of the naked body of Elizabeth Macri taken at the morgue January 24, 1954; he also identified two bullets or pellets removed from her body. On the same day and at the same place, he performed an autopsy on the body of Frank Macri, Sr., and identified two pictures (People's Exhibits F and G) of the naked body of Frank Macri, Sr., taken at the morgue on January 24, 1954. On the same day and at the same place, he performed an autopsy on the body of Frank Macri, Jr., (exact time of his death does not appear) and identified three pictures of the naked body of Frank Macri, Jr., (People's Exhibits H, I, J) taken at the morgue January 25, 1954. On February 10, 1954, he performed an autopsy on the body of Mary Macri Archina and identified two pictures (People's Exhibits K and L) of the naked body of Mary Macri Archina taken at the morgue on that day. He testified that all four died from gunshot wounds. The above pictures were admitted in evidence, all except one of Elizabeth, over defendant's objections.

Officers arriving at the scene shortly after the shooting found five empty 16-gauge shotgun shells in the bedroom, one empty 16-gauge shotgun shell in the dining room, one loaded 16-gauge shotgun shell near Luigi Archina, who, at the time, was lying in the alley; found defendant's 16-gauge shotgun and one 20-gauge loaded shell near thereto outside the house and close to the window through which the defendant had escaped.

The officers found one double barrel shotgun, 12-gauge, behind the kitchen door; it contained one loaded and one recently fired shell. Another single barrel shotgun was found in the house, it had not recently been fired.

The district attorney introduced in evidence a written, unsigned statement taken from the defendant and also statements made by defendant, not reduced to writing, in which the defendant denied shooting anyone, denied bringing the shotgun downstairs, admitted ownership of the 16-gauge shotgun, admitted he had the shotgun in his hands when it went off once or twice, admitted that he was in the bedroom during the shooting, stated that Frank Macri, Sr., "pulled a shot," that Frank Macri, Jr., was there and had a shotgun, that his brother, Luigi Archina, was not there and that defendant escaped through the bedroom window. On January 26, 1954, defendant wanted to talk to Detective Zarnow and the following was said:

"FRANK ARCHINA: Luigi didn't do it. ZARNOW: That leaves you. You are the only one left up there. FRANK ARCHINA: I say no more."

The evidence on the issue of insanity consisted of the testimony of Dr. J. L. Rosenbloom, Assistant Superintendent of Colorado State Hospital in Pueblo, and Dr. Emil J. Benz, member of the staff of the Colorado State Hospital, both qualified as experts and each expressed the opinion that the defendant was sane at the time of the shooting. Three lay witnesses, all relatives of the Macris, testified and expressed opinions that the defendant was sane.

The district attorney put in evidence the deposition of Dr. Giorgio Palermo to show his part in acting as interpreter at the hospital with reference to defendant's stay.

The defendant offered and the court admitted in evidence the deposition of Dr. Giorgio Palermo for the purpose of proving defendant insane. Dr. Palermo, according to his testimony was a graduate medical stu-

dent of the University of Rome and University of Bologna; had had one year of general private practice in Rome; had interned at St. Michael's Hospital in the United States; had spent one year as a resident at the Colorado State Hospital in Pueblo, and had been at Duke Hospital, Duke University, Durham, North Carolina, since July, 1954. At both the Colorado State Hospital and Duke Hospital, he was a resident in psychiatry. He had examined about one hundred patients for mental disorders before examining the defendant, and his impressions and diagnoses of these patients had been presented at staff meetings.

Dr. Palermo further testified that he had been in the hospital at Pueblo during the whole period that the defendant was in the hospital and because of his ability to understand and speak the language of the defendant he had more and greater opportunities for contacting, observing and appraising the defendant than did either Rosenbloom or Benz.

Dr. Palermo did not appear as a qualified expert; but as a medical doctor and psychiatric resident of the hospital expressed the opinion that the defendant was insane at the time of the alleged commission of the offense.

With reference to the marital status of Rose Macri Archina and the defendant, Francisco Archina, we have the following facts from Rose who testified that she was born at San Jose, California, on June 25, 1934, and at the age of 1½ years accompanied her parents to Italy and there remained until August 1952; she had known the defendant six months prior to the marriage and had, during said period, seen him twice a week, but always in the company of the family. On June 2, 1951, she went through a marriage ceremony with Frank Archina; the ceremony was performed by the Mayor of Siderno, Italy.

On direct examination of Rose, the following appeared:

"Q. Was there any conversation in Italy between you and Francisco Archina about this marriage being for the

purpose of enabling him to get into the United States? (Objections made by defendant and sustained) * * *. Q. Was there any other reason except love that you married him or he married you? A. The motive of coming to America. Q. Was that motive of coming to America discussed with Frank Archina? A. Yes. Q. What did Frank Archina say about that? A. He wanted to come."

Rose further testified that she never slept with the defendant, never had sexual intercourse with him and that she returned with her family to the United States in August 1952; that defendant and his brother, Luigi (who presumably had gone through a similar ceremony in Italy with Mary Macri Archina) came to the United States in December of 1952 and from the time of their arrival in Denver, except for about three months spent by the defendant in New York (Rose remained in Denver), the Archina brothers had their own bedroom in the Macri home and slept together; Rose and her sister Mary had their own bedroom and slept together; at virtually no time were Rose and Frank together alone. The defendant, when working and able, gave Rose's mother $20.00 per week to help pay the family expense, he gave Rose no money, but did buy her a dress for Christmas in 1952. When they were married in Italy, the defendant told Rose that he would come to America and then they would get married in church. After the defendant arrived in America, Rose asked him about getting married in church, and, about Christmas 1952, in the presence of all the family, asked the defendant about getting married in church. Her father said he wanted them to marry in the church, but defendant said that he "did not have a possibility" meaning he did not have the money for the expense of a wedding. The defendant bought the wedding ring in Italy.

On cross-examination of Rose, the following appears:

"Q. Were arrangements made over there (Italy) that after the marriage that both Frank Archina and Luigi Archina would come to America? A. Yes. Q. Now, was

there any conversations with you and Frank Archina before your marriage as to when you would be married in a church? A. Yes. Q. What was it? A. We talked about marrying in church after the civil marriage. Q. Was there any time set when it was to be? A. No. Q. Were those arrangements made by your father of by you? A. By my father. Q. Did he make the same arrangements for Luigi? A. Yes. Q. Did he say that he would decide when the marriage would be held? A. Yes."

The defendant, in his statements, made to the officers, had this to say about his marital status; he was married to Rose at Riggio, Italy. In answer to a question as to whether his marriage to Rose was consummated in the Civil Court in Italy, he answered through an interpreter: "A. He said, from the mayor. Q. Ask him if they just took out a license, or if the mayor only actually asked them the questions to make them man and wife. A. He gave him the license. Q. Ask him if the mayor performed the marriage ceremony. A. He held the ceremony for the marriage. Q. Ask him if he ever lived with his wife, as man and wife with Rose Macri. A. No. Q. Ask him if he ever slept with his wife, or had any sexual intercourse with his wife. A. Never. Q. Ask him if he considers himself at the present time, legally married to his wife. A. He doesn't consider her his wife until they're married in church."

The trial on the plea of not guilty lasted ten days and on March 17, 1955, the jury returned its verdict finding defendant guilty of murder in the first degree and fixing the penalty at death.

Trial on the insanity plea was had before a different jury on April 19, 1955, and resulted in a verdict finding the defendant sane.

Motions for new trials were filed, argued and overruled and sentence of death pronounced.

Counsel for defendant assigns 23 grounds or reasons for reversal and a new trial.

Counsel presents no argument with reference to seven

of these assigned errors, but does state in his brief that they are not abandoned. We have carefully considered these seven assignments and have concluded and hold that they and each of them are without merit.

The other assignments urged and argued by defendant's counsel will be considered in the order in which presented in his brief.

*FIRST POINT:* IT WAS ERROR TO PERMIT DEFENDANT'S WIFE TO TESTIFY.

Defendant relies on C.R.S. '53, 153-1-7 which, among other things, provides:

"WHO MAY NOT TESTIFY WITHOUT CONSENT. There are particular relations in which it is the policy of the law to encourage confidence and to preserve it inviolate; therefore, a person shall not be examined as a witness in the following cases: "(1) A *husband* shall not be examined for or against his *wife* without her consent, nor a *wife* for or against her *husband* without his consent; nor during the *marriage* or afterward shall either be examined without the consent of the other as to any communications made by one to the other during the marriage; but this exception does not apply to a civil action or proceeding by one against the other, nor to a criminal action or proceeding for a crime committed by one against the other." (Emphasis supplied.)

· Much time was consumed during the trial in argument as to whether the *wife* of defendant can testify in a prosecution against the *husband* for murdering the mother of the *wife.* The case of *O'Loughlin v. People,* 90 Colo. 368, 10 P (2d) 543 which holds that in a case where the *wife* is charged with the murder of her stepdaughter (the husband's daughter, that the above statute does not bar the *husband* from being a witness against the defendant, his *wife,* and for the reason that the killing was not only a public crime, but also a *crime* committed by one against the other. The trial court permitted Rose to testify against the defendant on the authority of the O'Loughlin case. Defendant assigns this

as error and contends that the O'Loughlin case stands alone, goes further than any case in the United States and should be confined to cases where the victim is the child of the spouse testifying and should not be extended to a case such as this where the victim is the mother of the spouse testifying. This question is fully and ably argued by defendant's counsel and by the Attorney General in briefs filed in this Court.

In the view which this Court takes of the factual and legal relationship existing between Rose Macri Archina and the defendant, Francisco Archina, at the time of the alleged offense and at the time of trial, it is unnecessary to discuss the O'Loughlin case or to determine whether Rose Macri Archina could testify in this case if she were the *wife* and Francisco Archina were the *husband*.

We are of the opinion, based on the facts presented by this record and the law applicable thereto, that Rose Macri Archina and Francisco Archina never were husband and wife within the meaning of C.R.S. '53, 153-1-7 and that said statute is no bar to either testifying for or against the other in this proceeding.

The statute clearly states the purpose of the legislature in adopting it:

"There are particular relations in which it is the policy of the law to encourage confidence and to preserve it inviolate."

The legislature expressly enumerated one of the relationships it had in mind to be that of *husband and wife.* It is necessary therefore to direct our attention to what is necessary to constitute that relationship.

A man and woman become husband and wife by virtue of marriage. Marriage, in law, has two well defined meanings.

(1) It is a civil contract that makes a man and a woman husband and wife.

(2) In a broader sense, it is a *status — a state of being* preceded by a contract of marriage, evidenced by a marriage ceremony as provided by law or a common law

contract of marriage, together with living together, sexual intercourse, marital duties of obedience, love, care, companionship, possibly and desirably children, a home soever humble, a union of thoughts, hopes, aspirations and endeavor, a union of their bodies with all of the attendant rights, duties, obligations, joys, happiness, sorrows and heartaches.

In this case, there is doubt as to whether these two young people ever entered into a binding civil contract. Rose said the ceremony was performed by the Mayor of Siderno, Italy, the defendant said it was performed by the Mayor of Riggio, Italy. There is evidence that the ceremony was for the purpose of enabling the defendant to gain admittance to the United States. The evidence of both is that there was to be a subsequent ceremony performed in accordance with the religious convictions of both and after such second ceremony and only then would they consider themselves husband and wife. The defendant states he did not consider himself married. The evidence shows the so-called bride's father was to determine when the religious ceremony was to occur.

Conceding that there was a valid contract of marriage entered into, it is very apparent that such was regarded by the parties as a preliminary formality, wholly lacking in binding mutual obligations and devoid of the usual attributes of marriage; it was transient; to be confirmed by another and formal ceremony which would make the marriage real instead of illusory.

It is inconceivable that the legislature, in adopting the above statute, intended to preserve inviolate such strange relationships as that existing between Rose and the defendant. That relationship was a cold, inanimate, lifeless relationship which had its beginning and end in a preliminary civil contract, in the minds of the parties amounting to nothing more than an agreement to marry at some time in the future. This defendant cannot use this statute, designed and intended to protect

and preserve an institution and status that from time immemorial has been the very foundation of civilization and survival of the human race, as a shield to escape the consequences of his unlawful acts.

We need only to follow well established rules of interpretation of statutes to justify our conclusion:

"* * * the primary rule of construction of statutes is to ascertain and declare the intention of the legislature, and carry such intention into effect to the fullest degree." (50 Am. Jur. 222, P. 201.)

We do not find any cases construing or interpreting the Colorado statute determining the legislative intent in the use of the words "husband" — "wife." In fact, we find few cases in any jurisdiction, probably for the reason that the relationship existing between these two people was an unnatural, weird anomaly of infrequent occurrence and has not often engaged the attention of the courts. There are numerous cases where parties have lived together, had children, engaged in other apparently marital activities, but had not gone through a marriage ceremony or consumated a common law marriage. In such cases, the courts have uniformily held that living together, whatever their intentions for the future, is not enough; that in order to invoke the statute, there must be a valid contract of marriage in existence at the time the testimony is offered.

In *United States v. Rubenstein 151 Fed. 2nd 915,* defendant was convicted in the District Court of the United States for the Southern District of New York upon an indictment for conspiracy to defraud the United States by obtaining the entry of an alien by false representation, by wilful concealment of material facts and by false statements in documents required by the immigration laws. Part of the false representation was the statement made by the defendant that one Alice Spitz, a Czechoslovakian, was married to one Sandler, an American, when he, in fact, knew that Spitz had contacted Sandler and had asked him to marry her so she

could "have my parents here from Czechoslovákia." Spitz told Sandler she did not want to live with him, but would give him $200.00 if he would marry her and that after six months there would be a divorce. The couple were married in Newark, N. J., by a judge; they at once separated, always lived apart, and the marriage was never consummated. The defendant, who represented these people to be husband wife, was convicted of false representation under the Federal Statutes.

The court, through Chief Judge Learned Hand, has this to say about marriage:

"Rubenstein knew that the parties proposed a divorce within six months, and that was a fact most material to the granting of the visa. The statute is not concerned with marriage, merely as marriage; one, perhaps the chief, reason why it allows the wife of a citizen to enter is because the husband will be responsible for her support. If the spouses at the time of the wife's entry intend that that responsibility shall end as soon as possible, they have evaded the statute by suppressing a material fact; and the suppression is a fraud, even though the marriage is valid. But, that aside, Spitz and Sandler were never married at all. Mutual consent is necessary to every contract; and no matter what forms or ceremonies the parties may go through indicating the contrary, they do not contract if they do not in fact assent, which may always be proved.

"It is quite true that a marriage without subsequent consummation will be valid; but if the spouses agree to a marriage only for the sake of representing it as such to the outside world and with the understanding that they will put an end to it as soon as it has served its purpose to deceive, they have never really agreed to be married at all. They must assent to enter into the relation as it is ordinarily understood, and it is not ordinarily understood as merely a pretence, or cover, to deceive others."

In *Lutwak, et al. vs. United States 344 U. S. 604; 73 S. Ct. 481* petitioners were convicted of conspiracy to

violate the immigration laws "by obtaining the illegal entry into this country of three aliens as *spouses* of honorably discharged veterans." The so-called War Bride Act provided: "* * * alien spouses * * * of United States citizens having an honorable discharge * * * shall be admitted."

Petitioners procured three United States citizens, honorably discharged veterans, to go from the United States to Paris, there to marry three Polish refugees. Marriage ceremonies were performed, but it was understood by all that they would not live together as husband and wife and would thereafter sever the legalities. None of the marriages was ever consummated.

Petitioners assigned as error that "the Trial Court permitted the wives to testify against their husbands." Rule 26 of The Federal Rules of Criminal Procedure provides:

"* * * The admissibility of evidence and the competency and privileges of witnesses shall be governed, except when an act of Congress or these rules otherwise provide, by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience."

Mr. Justice Minton has this to say about these marriages and the common law rule disqualifying one *spouse* from testifying in criminal cases against the other *spouse:*

"Much of the evidence of the conspiracy comes from the lips of the so-called wives of these spurious marriages. The next question with which we are confronted is whether these so-called wives are competent to testify against their purported husbands in this criminal prosecution and thus incriminate the so-called husbands.

"Civil marriage ceremonies were entered into by the parties in Paris as above indicated. Must these ostensible marriages be recognized as creating spouses in order that the marital relationship may be claimed to prevent the wives from testifying against the husbands? At common

law the wife could testify neither for nor against her husband in a criminal case * * *.

"Here again, we are not concerned with the validity of these so-called marriages. We are concerned only with the application of a common-law principle of evidence to the circumstances of this case. In interpreting the common law in this instance, we are to determine whether 'in the light of reason and experience' we should interpret the common law so as to make these ostensible wives competent to testify against their ostensible husbands. The reason for the rule at common law disqualifying the wife is to protect the sanctity and tranquility of the marital relationship. It is hollow mockery for the petitioners in arguing for the policy of the rule to invoke the reason for the rule and to say to us 'The husband and wife have grown closer together as an emotional, social, and cultural unit' and to speak of 'the close emotional ties between husband and wife' and of 'The special protection society affords to the marriage relationship.' In a sham, phony, empty ceremony such as the parties went through in this case, the reason for the rule disqualifying a spouse from giving testimony disappears, and with it the rule.

"The light of reason and experience do not compel us to so interpret the common law as to disqualify these ostensible spouses from testifying in this case. We therefore hold that in the circumstances of this case, the common-law rule prohibiting anti-spousal testimony has no application. These ostensible wives were competent to testify."

Rose Macri Archina, under the facts as disclosed by this record, was competent to testify against the defendant and for the reason that she was not the wife of the defendant as contemplated by the statute. Our decision here is limited to an application of the statute to the facts as disclosed by this record.

*SECOND POINT:* THE DEPOSITION OF DR. JOHNSON.

It is urged for reversal that it was error to admit in evidence the deposition of Dr. Johnson for the following reasons:

(a) There was no showing that the witness was not available to testify. (b) The evidence was inadmissable as a part of the res gestae and also inadmissable under the doctrine of similar acts or offenses.

(a) In our statement of facts, we have outlined in detail the evidence touching on the question of the availability of Dr. Johnson as a witness at the time his deposition was offered and admitted in evidence over defendant's objections.

The evidence is undisputed that Dr. Johnson was in Denver August 23, 1954; there is ample evidence that he intended to leave Denver three days later for Alabama and that *sometime* later he intended to proceed to Germany. There is no evidence that Dr. Johnson ever left Denver, there is no evidence that he ever went to Alabama or Germany. There is evidence he was not at the Denver General Hospital on February 16, 1955. There is evidence he was not in the court room March 10, 1955, at the time his deposition was admitted in evidence. Other than as outlined above, there is no evidence as to the whereabouts of Dr. Johnson during the period August 23, 1954, to March 10, 1955. This evidence does not warrant the finding of the trial court that Dr. Johnson was not available as a witness.

The record fails to show any appreciable effort on the part of the district attorney to produce the witness or evidence that he was not within the jurisdiction and available. The negligible amount of testimony offered was all negative. Proof that the doctor was not at the hospital falls far short of proof necessary to support a finding that he was not available. Positive proof as to his whereabouts on the day of trial would have proven his availability or unavailability. From facts as shown by this record, it would seem that a couple of hours' inquiry would have produced positive proof of the loca-

tion of the witness, thereby enabling the court to make a definite and positive finding as to his availability. The finding of the court, if it can be called a finding, that the witness was not available is not supported by the evidence.

*Haynes vs. People 128 Colo. 565; 265 P (2d) 995* is a case in point.

(b) We also find and hold that much of the testimony of Dr. Johnson is inadmissible as hereinafter specifically pointed out. His testimony deals with what he did and saw done at the morgue, on January 25th and February 10th, 1955. There is nothing to indicate that he was ever at the scene of the shooting. He was one of the actors on a new and separate stage set up, with all its scenery and props, by parties other than the participants in the events which had occurred at 3949 Tejon Street.

(1) Dr. Johnson stated that he performed an autopsy on the body of Elizabeth Macri, that she had died instantly of gunshot wounds; that he removed two bullets from her body, that People's Exhibits D and E, photographs, are true and accurate pictures of the naked body of Elizabeth Macri, as the same appeared at the morgue. This testimony and these exhibits were admitted in evidence over the vigorous and repeated objections of defendant. (Defendant's counsel did agree—we think improperly—that one of these pictures could be put in evidence). The doctor's testimony concerning the cause of death, although cumulative, is not objectionable. The pictures of the naked body on the marble slab have no probative value in establishing any issue in the case. There are two other pictures of the body of Elizabeth Macri taken shortly after the shooting, showing the location of the body in the house and before removal, these pictures were admitted without objection; at least a half dozen witnesses testified that Elizabeth Macri died instantly as a result of gunshot wounds; Rose testified that the defendant fired the two shots that killed her mother. Just what material fact did these horror

pictures, taken on a new stage at a new time, new actors, prove or tend to prove? Pictures of a nude body do not even prove the person to be dead. Generally speaking, it is the duty of the District Attorney to present all available facts so that the jurors may, through their mental processes, arrive at the guilt or innocence of the defendant. It is not his duty or right to produce or present evidence that has no probative value and that serves only to arouse the passions and prejudices of the jurors. These pictures do not serve to stimulate the mental processes of the jurors, but only to arouse their passions and prejudices—and to cause them to abandon their mental processes and give expression to their emotions.

(2) Dr. Johnson stated that he performed an autopsy on the body of Frank Macri, Sr., and that he died of gunshot wounds. He identified two pictures, People's Exhibits F and G, of the naked body of Frank Macri, Sr., taken at the morgue. These pictures were inadmissible for the same reasons that Exhibits D and E are inadmissible and for the further reason that the defendant was not on trial for the death of Frank Macri, Sr. The District Attorney contended that these pictures were a part of the res gestae. Clearly they were not and the Attorney General has apparently recognized that fact for he does not contend that they were a part of the res gestae, but argues that the testimony and pictures were admissible to prove similar offenses. This position is equally untenable for the reason that this record is devoid of any evidence as to who fired the shots that caused the death of Frank Macri, Sr. The Attorney General, in answer to this, states: "The circumstantial evidence on the fact is clear beyond a reasonable doubt."

From the record before us, such fact does not appear clear to this court beyond a reasonable doubt or at all. Without the eye witness testimony of Rose, there is nothing in this record to prove who fired any of the shots.

(3) Dr. Johnson's testimony with reference to Frank Macri, Jr., is the same as with reference to Frank Macri, Sr., except the autopsy was performed a day later. The pictures, three, People's Exhibits H, I, J, were taken a day later and showed evidence of extensive surgery, presumably performed after the shooting in an effort to save his life. There is nothing in the record to indicate who shot Frank Macri, Jr.

(4) Dr. Johnson testified that Mary Macri Archina died February 10, 1954, from gunshot wounds inflicted January 24, 1954. He identified two pictures, People's Exhibits K and L, of the naked body of Mary Macri Archina taken February 10, 1954, at the morgue. Here we do have a similar offense, we have the undisputed testimony that the defendant loaded his gun, fired two shots into the body of Elizabeth Macri while she was cowering in the closet begging for mercy. The defendant went through the same process of loading the gun and fired two shots into the body of Mary Macri Archina cowering in the same closet. It was all a part of the same transaction, part of a plan and scheme and evidence thereof was admitted without objection. The testimony of Dr. Johnson showing the cause of death was clearly admissible. The two pictures of the naked body of Mary Macri Archina, taken at the morgue 17 days after the shooting showing the results of extensive surgery performed after the shooting, are clearly inadmissible. The pictures do not prove or tend to prove any issue in the case. It may be suggested they prove the nature and extent of her injuries—they do not, but rather prove the handiwork of surgeons who, in their efforts to save her life, had largely covered up evidence of the handiwork of the defendant. These pictures do not portray anything that occurred at 3949 Tejon Street. There are several good word pictures in evidence of the scene at the Tejon Street address—several witnesses testified that Mary was propped up against the wall in the bedroom moaning, her stomach shot away by the

defendant, holding her intestines in her hands. That is certainly a horror picture, a true one, that is inextricably interwoven with the offense for which the defendant was tried; the defendant participated in creating that scene of death, destruction and desolation; evidence thereof is admissible, the defendant must answer for it and explain it away if he can. On the contrary, he had nothing to do with the scene at the Denver morgue 17 days later and he is not answerable for it and necessarily cannot explain it away.

None of these pictures is admissible, they are without probative value, they serve only to incite the jurors to passion, prejudice, vengeance, hatred, disgust, nausea, revolt and all of the human emotions that are supposed to be omitted from the jury's deliberations. Their admission was highly prejudicial and calls for a reversal.

*St. Luke's Hospital Association, et al. vs. Long, et al. 125 Colo. 25; 240 P. (2d) 917.*

In this civil case, it was held error to admit pictures which had "no substantial testimonial value." The rule of exclusion should be even more strictly followed in criminal cases.

We quote from the above case: "Error is predicated again on receipt in evidence as an exhibit of a picture of David's body, taken two days after the death, showing the incisions and sutures made in performing autopsies on the body. The only purpose of the exhibit, apparent or urged, was to show a mark on the lower cheek which could have resulted from the catching of the head between the rods of the side rail.

"Here the cause of death was so firmly established without dispute that there could be no substantial testimonial value in the picture. Had it been that of the head alone, showing merely the bruise, it might have been admissible, but the showing of the disfiguration of the body by the autopsies is pitiful and distressing and

irrelevant to the issues. In case of retrial the entire photograph should not be received."

*Martinez vs. People 124 Colo. 170; 235 P. (2d) 810* is distinguishable from the case at bar. The picture of the body of Trujillo at the morgue showed the body in the condition it was in when the victim died in the ambulance on the way to the hospital:

"The face was smeared over with dried blood, his clothing disheveled and blood stained, the picture identifies the dead man."

A casual comparison of this situation with the pictures of the naked body of Mary Macri Archina, showing extensive surgery in an effort to save her life, taken seventeen days after the event, discloses a situation very different from those present in the Martinez case.

■ The Attorney General argues that all of the pictures and the testimony of Dr. Johnson were admissible as evidence of similar acts or offenses and states the rule: "Evidence as to the other acts or offenses is necessarily admissible when those things are so inextricably interwoven with the offense on trial that it is impossible adequately to show it without them."

That rule was followed in this case and a detailed word and photographic picture given as to occurrences and conditions at 3949 Tejon Street on the day of the shooting. The rule manifestly has no application to occurrences and conditions at the morgue, the defendant never having been there.

*THIRD POINT:* THE RES GESTAE STATEMENTS OF ROSE MACRI ARCHINA WERE NOT ADMISSIBLE.

Having held that Rose was a competent witness to testify against defendant, we now need only pass on the admissibility of the hearsay statements made by Rose:

"My Mama's dead; my husband's dead; my husband did it."

Counsel for defendant contends that Rose, at the time she uttered those words, was mentally upset and hysteri-

cal and did not know what she was talking about for she said "my husband is dead" when, in fact, he was not dead. The reasons above urged as ground for exclusion of this outcrying of Rose are, in our opinion, the very basis and reason for admitting them.

██ Under the well established doctrine of res gestae, unsworn statements are admitted on the theory that they are spontaneous utterances, dominated and evoked by the transaction itself, and are not the result of premeditation, reflection or design. Rose was not in the position of one paying a visit to her neighbor to tell her about the shooting at her home; moments before the utterances objected to, Rose was cowering in a closet with her mother and sister; she had just witnessed the inhuman slaying of her mother, witnessed her sister mortally wounded, had the gun put to her own throat and fail to fire; she had jumped through a window, in the middle of winter, without shoes, her legs bloody and ran crying to her neighbor; she was wild looking, quite hysterical, crying, nervous, frightened, upset.

These are the very things that gave rise to the doctrine of res gestae. The words and actions of Rose were not narrative. They were the spontaneous reactions of her tortured body, mind and soul. It is preposterous to entertain the thought that Rose, in her then extremity, was anything but truthful and honest; that is the very basis of the doctrine of res gestae.

*FOURTH POINT:* (1) TESTIMONY OF ROSE (2) THE DEPOSITION OF DR. JOHNSON (3) THE TESTIMONY OF MRS SWOBADA WITH REFERENCE TO THE SUPPOSED RES GESTAE STATEMENTS OF ROSE AND (4) DENIAL OF DEFENDANT'S MOTION TO STRIKE THE ABOVE AND DENIAL OF DEFENDANT'S MOTION FOR MISTRIAL.

These points have been disposed of above and further comment is unnecessary.

*FIFTH POINT:* ALLEGED PREJUDICIAL REMARKS OF THE DISTRICT ATTORNEY.

(a) The district attorney, in his opening statement, among other things told the jury:

"The evidence, Ladies and Gentlemen, that we will produce here will show that all four of these people (Frank Macri, Sr.; his wife, Elizabeth Macri; their son, Frank Macri, Jr.; and their daughter, Mary Archina) were killed deliberately in cold blood. Their deaths were caused by the bullets from a 16-gauge double barreled shotgun fired by the defendant."

The defendant promptly objected to this statement and moved for a mistrial which was denied.

The record shows that the district attorney made good on fifty percent of his statement, the killing of Elizabeth and Mary; as to the other fifty percent, he failed entirely; he failed to offer any evidence that the defendant killed Frank Macri, Sr., or Frank Macri, Jr.

It may seem trite for this court to again admonish prosecuting attorneys with reference to stepping beyond the rules of propriety in presenting matters before the jury. District attorneys devote hours and days, at great expense to the taxpayers, selecting jurors who are without prejudice, jurors who will be fair, not be governed or influenced by their feelings or passions, jurors who will exercise their mental processes and a true verdict render on the evidence. Having procured such a jury, they then proceed in many cases, far too many, to embark upon a program, knowingly or unwittingly, designed to produce results founded on passion and prejudice rather than on truth and reason. Improper opening statements, improper evidence, exclusion or suppression of evidence that should be submitted, improper remarks during the trial in the presence of the jury, improper arguments to the jury should be scrupulously avoided by all attorneys. True, only a limited number of cases have been reversed by this court on account of misconduct on the part of prosecuting attorneys. The Attorney General cites several cases decided by this court in which the district attorney was guilty

of misconduct, but the court refused to reverse because it did not appear that the misconduct prejudiced the rights of the defendant. We have no way of knowing positively what remarks may be prejudicial and what may not be.

That part of the opening statement above quoted was highly improper, it proved factually untrue, and untrue statements should not be made to jurors and certainly should not be repeated.

## WITH REFERENCE TO THE TRIAL ON THE ISSUE OF INSANITY.

*SIXTH POINT:* LIMITING VOIR DIRE EXAMINATION OF JURORS.

Defendant contends that the jury was an unlawful jury for the reason that the trial court ordered the attorneys for the State and for the defendant to refrain from asking any prospective juror whether his verdict on the sanity issue might be influenced by his knowledge that if the defendant were found insane he would not be executed.

The only question to be presented to this second jury was the question whether the defendant was sane or insane at the time the offense was committed. The penalty had already been fixed by the jury that tried the defendant on the substantive case.

The trial court has the right and duty to determine the extent and scope of examination of prospective jurors and, except for abuse of discretion in its rulings, will not be disturbed on review. This matter was within the sound discretion of the trial court and we find no abuse of that discretion.

*Routa vs. People 117 Colo. 564; 192 P (2d) 436.*

*SEVENTH POINT:* RIGHT OF REASONABLE CROSS-EXAMINATION.

Defendant contends that he was deprived of the right of reasonable cross-examination of People's expert witness, Dr. J. R. Rosenbloom, a psychiatrist and assistant

superintendent of the Colorado State Hospital at Pueblo, Colorado.

This expert testimony was of most vital importance — it meant life or death to the defendant.

 The right of cross-examination is a valuable constitutional right guaranteed to all defendants. True, the trial judge determines the scope and limits of the examination and except for abuse of discretion his rulings will not be disturbed on review.

On direct examination, Dr. Rosenbloom testified in detail of procedures followed in arriving at his opinion that the defendant was sane.

It is easy for an expert to express an opinion, difficult for laymen to evaluate it or to determine its correctness. Great latitude of cross-examination should be allowed to the end that the jury may know the *truth*. It is true the defendant was permitted to cross-examine the witness and did so at considerable length.

 It was brought out that Dr. Rosenbloom, during the period of his observation of the defendant, had in his possession certain documents and defendant's counsel undertook to find out by further cross-examination what, if any, influence those documents had on Dr. Rosenbloom in arriving at his opinion. The district attorney objected to this further cross-examination and was sustained. The defendant made an offer of proof:

"MR. RICE: If it please the Court, I offer to prove by this witness that the hospital received from Gregory Mueller, Deputy District Attorney, who is counsel in this case, copies of the statement — alleged statement of Frank Archina by a letter dated May 3, 1954, which letter is in the file, saying 'Trusting these documents may help you in your examination.'

"Then here is the statement of Frank Archina, Mike Carbetta, Rose Archina, and Steve Macri, and a digest of the evidence in this case written by E. M. Shepard, Deputy District Attorney, of the City and County of Denver.

"I further propose to show that these statements were the ones that were read by Dr. Palermo to the staff meeting that the doctor just testified to.

"MR. KEATING: If the Court please, you will recall that we asked to use the records of the hospital. The Court then sustained the objection of counsel. MR. RICE: I am not offering to use the records. I am showing that I can prove by this witness that they received the documents — these documents — and they were read to the staff meeting. He already testified that these questions and answer forms were read at the staff meeting and translated into Italian. Certainly, I believe we have the right to go into the use of those documents, and what they used them for, and whether or not they have anything to do with the opinion formed in this case of this witness. MR. KEATING: They are hearsay reports. MR. RICE: They were read to this defendant. THE COURT: If I didn't let them in this morning, I won't let them in this afternoon. MR. RICE: Save an exception."

The trial court's statement, "If I didn't let them in this morning, I won't let them in this afternoon," has the virtue of consistency, but the vice of being erroneous.

The district attorney said with reference to these reports:

"They are hearsay reports."

That statement is true and goes to the very heart of the problem. If those hearsay reports entered into the opinion expressed by the doctor, then his opinion is made up of hearsay and is inadmissible.

In *Ingles v. People*, 90 Colo. 51, 6 P. (2d) 455, the conviction was reversed because the doctor's opinion was partly based on information furnished by others — hearsay. The court says:

"Clearly, the court should not have permitted the doctor to state to the jury his conclusion based, in part, on the information thus obtained from third persons.

"A physician is permitted to express his opinion based

upon facts personally observed by him, in connection with the defendant's history given by the defendant to the physician; also to express his opinion based upon facts that are in evidence.

"He cannot express an opinion based, in whole or in part, upon information obtained from third persons who have not testified to the facts."

Defense counsel should have been granted the right to cross-examine the doctor and at length with reference to every one of those documents. The doctor had these documents for some purpose, the district attorney sent them to him for some purpose, they were read at the staff meetings for some purpose. Defense counsel should have been permitted to ask the witness when he received these documents, from whom and under what circumstances, what he did with them, what use he made of them in performing his *official duty, what, if any part, each document played in arriving at his conclusion that the defendant was sane.*

The doctor's answers to these questions might have added weight to his opinion *or* his answers might have disclosed the fact that his opinion was partially based on hearsay and therefore inadmissible. The purpose of the trial was to present the *truth* so a true verdict might be reached. The objection to the proposed cross-examination should have been overruled, the court, in sustaining the objection, abused its discretion, deprived the defendant of important constitutional rights, and the verdict must therefor be set aside and a new trial granted on the question of defendant's sanity.

*EIGHTH POINT:* FORMS OF VERDICTS SUBMITTED.

Defendant complains of the forms of verdict given to the jury because they vary from the *statutory form* in that they use the words "legally sane" and "legally insane," whereas it is claimed the staute uses only the words "sane" and "insane."

Counsel, in support of their contentions, refer to:

*Mundy vs. People, 105 Colo. 547; 100 P (2d) 584.*

In that case, both questions, *guilt* and *sanity*, were tried together and before the same jury and pursuant to Sec. 510, Ch. 48, 35 C.S.A., then in force, it was mandatory that the court give to the jury a form of verdict with the words thereon, "not guilty by reason of insanity." The above section was amended in 1951 and the only requirement set up with reference to the verdict is:

"* * * the jury shall return a verdict either that the defendant was sane at the time the offense was committed or that he was insane at the time the offense was committed." C.R.S. '53, 39-8-4.

Mundy v. People relied upon by defense counsel has no bearing on the question here involved for that case is based on a statute which was amended prior to the shooting and prior to the trial of this case.

The whole purpose of the trial was to have the jury determine whether the defendant was legally sane or legally insane. The verdict returned was a complete, legal answer. We find nothing objectionable in the form of the verdict.

*NINTH POINT:* INSTRUCTIONS GIVEN.

Defendant urges as grounds for reversal the giving of instructions numbered 2, 6 and 10. In view of the fact that a new trial must be had on other grounds, we do not deem it necessary or advisable to pass on the correctness of the instructions given.

The record in this case discloses that the district attorney has available an ample supply of admissible, competent, credible evidence touching on the issues involved. On retrial, the same should be presented, and the evidence which we have held to be inadmissible should be excluded.

The judgment is reversed and the cause remanded with directions to set aside the verdicts and grant a new trial in conformity with the views herein expressed.

Mr. Justice Day having presided as trial judge when

42

this defendant was first brought to trial, empaneled a jury, heard the opening statements and declared a mistrial because of the illness of a juror, does not participate in the decision of this case.