## No. 24461

**Donald E. Carroll v. The People of the State of Colorado**
(494 P.2d 80)

Decided February 22, 1972.          Rehearing denied March 13, 1972.

Rollie R. Rogers, State Public Defender, J. D. MacFarlane, Chief Deputy, Thomas M. Van Cleave, Deputy, Natalie S. Elwood, Deputy, for plaintiff in error.

Duke W. Dunbar, Attorney General, John P. Moore, Deputy, Dorothy E. Binder, Assistant, Aurel M. Kelly, Assistant, for defendant in error.

*En Banc.*

MR. JUSTICE GROVES delivered the opinion of the Court.

The defendant (Carroll) was convicted of first degree murder and sentenced to life imprisonment. We affirm.

At approximately 11:30 p.m., on February 24, 1969, one Richard M. Root died almost immediately following the infliction of a gunshot wound. This was in the parking lot of the Harem Lounge in Denver. He had been shot once by a .22 caliber weapon held against his chest.

Earlier in the evening, the defendant and the deceased were together in the Harem Lounge. The decedent had endorsed his paycheck and given it to the bartender. During the course of the evening and in the presence of the defendant, the decedent asked the bartender to give him $60. The bartender responded that decedent already had $20. The decedent insisted and the bartender gave him the additional $60.

The defendant drank heavily during the evening. At one point the defendant left the bar for a short time. After his return and when he was demanding more to drink, a handgun fell from his pocket.

The defendant again left the lounge. Shortly thereafter the deceased left by a route leading to the parking lot. The body of the deceased was found less than fifteen minutes from the time he had departed from the lounge. No money was found upon the decedent. The gun which fired the fatal bullet was found under some bushes four blocks from the lounge. The defendant was arrested at 12:30 the same night, and he did not have the money.

The defendant made an extrajudicial statement to the effect that he had not possessed nor fired a gun for six years. Tests performed on residue taken from the defendant's hands at the time of his arrest, in the opinion of an expert, disclosed that he had fired a gun with his right hand recently. A witness testified that previously he had sold the death weapon to the defendant. The conviction was predicated upon circumstantial evidence.

I.

At the beginning of the *voir dire* of the prospective jury, the district attorney stated that he was not going to ask for the death penalty. The defendant assigns as error the fact that the district attorney questioned the prospective jurors concerning the death penalty and that the judge excused for cause nine who stated in effect that under no circumstances would they impose a death sentence.

The defendant urges *Stratton v. People,* 5 Colo. 276 (1880), as authority. In *Stratton,* the jurors stated that they had scruples against the death penalty, but would follow the law. The case was reversed by reason of the trial court having excused them for cause. The holding, as in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968), was that all the law requires is that, notwithstanding his conscientious scruples, a juror will render a verdict in accordance with the law and the evidence.

The defendant makes the distinction that in *Atencio v. People,* 147 Colo. 566, 364 P.2d 575 (1961), the district attorney did not state at the inception of the case that he would not seek the death penalty. We are unconvinced that the statement of the district attorney forecloses

his right to death-qualify the jury. As was mentioned in *Atencio, supra,* and *Hampton v. People,* 171 Colo. 153, 465 P.2d 394 (1970), it is conceivable that direct evidence might arise during the course of a trial, which would permit the jury to consider the death penalty. Once direct evidence of guilt is in evidence the earlier statement of the district attorney should not and could not prevent submission of the issue to the jury. Thus, the death-qualification was not improper.

■ The defendant contends that his Sixth Amendment rights were violated. In this connection, as well as in the broader view of the issue, we find Mr. Justice Stewart's statement in *Bumper v. North Carolina,* 391 U.S. 543, 88 S. Ct. 1788, 20 L. Ed. 2d 797 (1968), persuasive:

"In Witherspoon v. Illinois. . . we have held that a death sentence cannot constitutionally be executed if imposed by a jury from which have been excluded for cause those who, without more, are opposed to capital punishment or have conscientious scruples against imposing the death penalty. Our decision in Witherspoon does not govern the present case, because here the jury recommended a sentence of life imprisonment. The petitioner argues, however, that a jury qualified under such standards must necessarily be biased as well with respect to a defendant's guilt, and that his conviction must accordingly be reversed because of the denial of his right under the Sixth and Fourteenth Amendments to trial by an impartial jury. [Citing cases] We cannot accept that contention in the present case. The petitioner adduced no evidence to support the claim that a jury selected as this one was is necessarily 'prosecution prone,' and the materials referred to in his brief are no more substantial than those brought to our attention in Witherspoon. Accordingly, we decline to reverse the judgment of conviction upon this basis."

The record contains only excerpts from the voir dire examination, referring solely to the nine jurors who were excused for cause. Here, as in *Bumper,* nothing is before us to support the claim that the jury selected was not impartial.

The defendant has argued further that this caused the jury

not fairly to represent a cross-section of the community. We find the "cross-section" cases cited not in point.

II.

At the time the defendant was arrested, he was advised that he was under arrest for an investigation of a shooting that had taken place that evening. He was then advised of his *Miranda* rights. Upon arrival at the police station, he was again advised of his rights. He stated that he did not understand his rights and did not want to talk to the officers. No attempt was made to question him. Within ten minutes, he told the officers that he had changed his mind, that he did understand his rights, and that he wanted to talk to them. He was advised of his rights a third time; he acknowledged that he understood them and signed the advisement form. Under police rules, the officers awaited the arrival of a detective, who questioned the defendant. We infer from the record that the detective arrived in about a half-hour, at which time the defendant was advised for the fourth time of his rights. He again acknowledged verbally and in writing that he understood his rights and that he wanted to talk to the officers. He was questioned, and a transcript of the questions and answers was admitted in evidence at trial.

Two portions of the defendant's answers were highly incriminating. These were his denial of having a gun during the evening and his statement that he had not owned or touched a gun in six years. A forensic chemist, who had made tests of the materials removed from the defendant's hands after his arrest, testified that in his opinion the defendant had fired a gun with his right hand between the time he had last washed his hands with soap and water and the time that the residues were taken from his hands. Also, as mentioned, other evidence linked him with the death weapon.

During the questioning, the defendant inquired as to the charge against him, and was advised that it was homicide.

The defendant contends that his rights were violated under *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), in the following particulars: (1) He was not sufficiently advised in advance of the questioning as to the

charge against him. (2) He was detained in the interrogation room from the time he refused to talk until ten minutes later when he stated that he wished to talk. (3) After he stated that he did not wish to talk, he should not have been questioned further. (4) There was too great an elapse of time between the time he said he wished to talk and when the detective arrived. (5) Because he was intoxicated, his statement could not have been voluntarily given, nor could he have validly waived his right to counsel and his privilege against self-incrimination.

■ We regard the advice given him at the outset — that he was held in connection with a shooting that occurred that evening — as adequate information as to the reason for his arrest.

■ During the ten-minute period which occurred after his refusal to talk, a police officer at the jail was doing the necessary paper work in order to book him. We perceive no unreasonableness here, nor any coercion, direct or indirect.

■ We know of no authority that prevents custodial interrogation when the person arrested spontaneously changes his mind and volunteers that he wishes to talk.

■ Likewise, we see no violation of rights in the delay occasioned until the detective arrived.

■ The trial court made a finding to the effect that his intoxication was not to an extent which would make his statement inadmissible. This conclusion is supported by the evidence. The jury was properly instructed as to the requirement of voluntariness of a statement. The defendant did not attempt to introduce evidence as to his intoxication and offered no instruction on the subject. The point is not mentioned in the motion for new trial.

We do not find reversible error in the admission of defendant's statements.

### III.

■ The prosecution offered in evidence Exhibits A, B, C, and D, which were pictures of the victim's body. Exhibits A and B were taken at the scene of the shooting, and C was taken at the morgue. In all three, the body was clothed. In all

of the three, in addition to blood in the chest area, where the bullet entered, they showed blood which had flowed extensively from the victim's nose and mouth. Exhibit D was taken at the morgue after the victim's clothing had been removed. Counsel for the defendant stated that he had no objection to the admission of Exhibit A. His objection to Exhibit B was solely that "it is the same thing, the same picture." The court admitted Exhibits A and B. As to C and D, the court required the prosecution to elect between the two. C was offered, and D withdrawn; and the court admitted C.

The defendant argues that Exhibit C was cumulative and highly inflammatory. It is difficult to understand how the admission of Exhibit C can be deemed highly inflammatory, when Exhibits A and B were similar and were in evidence.

Several cases have been cited to us. We find most of them not sufficiently in point, and have concluded that this assignment of error should be measured under the standards of *Archina v. People,* 135 Colo. 8, 307 P.2d 1083 (1957), and *Stout v. People,* 171 Colo. 142, 464 P.2d 872 (1970). In *Archina,* there were involved pictures portraying the nude bodies of four deceased persons. It was held that they were without probative value and they served "only to incite the jurors to passion, prejudice, vengeance, hatred, disgust, nausea, revolt, and all of the human emotions that are supposed to be omitted from the jury's deliberations." We do not find the attorney general's argument as to probative value very persuasive. However, we conclude that Exhibit C was not so inflammatory that it would prejudice the jury. None of the three of these exhibits approaches the horror of those in *Archina.*

In *Stout,* we held that the discretion of the trial court in the admission of photographs will not be disturbed unless they are not probative of any issue *and* they might unnecessarily inflame the minds of the jury because of their shocking nature. The admission of Exhibit C was not reversible error.

IV.

In his brief, the defendant states that the case was

tried solely as one of felony-murder, *i.e.,* murder committed in the course of a robbery. He then argues that there was no evidence of a robbery. As we read the instructions, the issue of first degree murder, independent of robbery, was also submitted. In addition, the possibility of guilt of second degree murder, which cannot be submitted if only felony-murder may be involved (C.R.S. 1963, 40-2-3), was placed before the jury.

We first consider the matter under the assumption *arguendo* that the defendant is correct in his statement that the case was tried solely as a felony-murder. The evidence showed that, within about a half-hour before his body was discovered, the victim had a little less than eighty dollars in bills in a money clip on his person. Neither bills nor money clip were found on the corpse. The defendant had had an opportunity to observe the amount of money which the deceased was carrying. He then left the premises for a short time, and the gun was seen for the first time upon his return. This gun was similar in appearance to the death weapon. A witness testified that he had sold the death weapon to the defendant. The defendant and the deceased left the tavern within minutes of each other. The gun was held in contact with the body of the victim at the time it was fired. This, in our view, constituted sufficient evidence for the jury to find that the defendant killed the victim in the process of a robbery.

■ The defendant argues that under *Ziatz v. People,* 171 Colo. 58, 465 P.2d 406 (1970), "the facts and circumstances must be such as are inconsistent, upon any reasonable hypothesis, with the innocence of the defendant, and incapable of explanation upon any reasonable hypothesis other than that of the guilt of the defendant." The jury was so instructed. The record, in our view, does not justify overruling the jury's conclusion in this respect.

■ The defendant argues that the instructions submitted to the jury only cover the issue of felony-murder as there was no instruction on premeditation. The first two paragraphs of Instruction No. 10 given to the jury, being the second degree murder stock instruction, read:

"If you do not find the defendant guilty of murder of the first degree, it will be your duty to determine whether or not he is guilty of murder of the second degree, as defined and explained in these instructions.

"Murder of the second degree is the unlawful killing of a human being with malice aforethought, but without deliberation and premeditation."

The instruction continues with a discussion of implied malice in murder of the second degree and the conditions upon which the defendant should be found guilty or not guilty of that offense. The jury was also instructed that homicide committed in the perpetration of a robbery negates the necessity of establishing malice, deliberation, premeditation, and intent. Considering the instructions as a whole, the jury was adequately advised with respect to premeditation.

It is thus apparent that the question of guilt of first degree murder, independently of the commission of robbery, was submitted to the jury. Here, again, the jury was to consider the matter under the rule of *Ziatz, supra.* The record is such that it could apply the rule and find that the defendant did "of his premeditated malice aforethought, kill and murder," and thus have committed first degree murder.

Judgment affirmed.