Floyd A. BUNTIN, Plaintiff in Error,

v.

The STATE of Oklahoma, Defend-
ant in Error.

No. A–13344.

Court of Criminal Appeals of Oklahoma.

Jan. 11, 1965.

Rehearing Denied June 23, 1965.

Leon J. York, Stillwater, Donald L. Worthington, Cushing, John W. Tillman, Don Hampton, Pawhuska, for plaintiff in error.

Charles Nesbitt, Atty. Gen., Jack A. Swidensky, Asst. Atty. Gen., for defendant in error.

BUSSEY, Judge:

Floyd A. Buntin hereinafter referred to as defendant was charged with the crime of Murder. He was tried by jury who found him guilty of the included offense of Manslaughter in the First Degree, and appeals.

Since the principal assignment of error is that the evidence adduced on the trial was wholly insufficient to support the verdict of the jury, we deem it necessary to set forth in detail the evidence adduced on trial.

On the evening of March 20, 1962 at 11:45 P.M., Clyde C. Raper, the night dispatcher for the Stillwater Police Department, in response to a telephone call, dispatched Units #1 and #12 to investigate a reported prowler on the premises of 720 Willow Road. At 11:48 P.M., the dispatcher received a call from Mr. Floyd A. Buntin from that address, advising that he had shot a prowler.

This information was communicated to officers in Units #1 and #12 and the dispatcher requested that the Strode Funeral Home dispatch an ambulance to that address. Dispatcher Raper also notified Sheriff Charlie Fowler, the Chief of Police, Ralph White, and the Medical Examiner, Dr. R. E. Roberts, and called the Assistant County Attorney, David Swank.

When Officers Lt. Ramsey and Erwin C. Grau, in Unit #1, and Captain Dawson, in Unit #12 arrived at 720 Willow Road, they observed the Floyd Buntin home which faces in an easterly direction, the front

porch light was on and Mr. Floyd Buntin approached them and took them to the northeast corner of the dwelling, where, approximately six or seven feet from the house, and lying with the head resting in a westerly direction and the feet in an easterly direction, they observed the figure of a young may lying on his back. The man's body lay in a shadow of the north roof line of the house and when Mr. Buntin directed an officer's flashlight on the face of the man, he remarked: "I think this is Jay Jones, the boy that has dated my daughter."

Attendants of the Strode Funeral Home arrived at the scene, removed the body to the emergency room of the Stillwater Municipal Hospital, and after it had been examined by Dr. Roberts, the Medical Examiner, it was removed to the Strode Funeral Home, where it was determined that the deceased was John Loren Jones, Jr. The clothing of the deceased contained a pencil, .56¢ and a key to his room. The clothing of the deceased were removed and placed in the custody of the Sheriff, Charlie Fowler, and introduced at the trial over objections of defendant, and the key was given to John Deming, roommate of the deceased.

A subsequent autopsy was conducted by Dr. Shideler, who determined that the cause of death was produced by gunshot wounds inflicted on the back and left arm of the deceased. He testified that there were 135 points of entry on the back of the deceased and that they entered on a horizontal direct plane from the posterior to the anterior of the body, penetrating the lungs, heart, aorta, liver and left kidney, and fracturing the 9th, 10th and 11th ribs. There were stray pellets entering the left arm. Pictures of these wounds and the body of the deceased were taken at the morgue and introduced on the trial, over the objection of the defendant.

Uncontroverted evidence discloses that the wounds were made by #4 shotgun pellets fired by Mr. Floyd A. Buntin from the right barrel of a double barrel Sixteen Gauge shotgun belonging to him. Deputy Sheriff Frank Cundiff testified that the pattern of the shotgun blast on the back of the deceased was 10 inches across and 11½ inches up and down. Jesse Berger, Deputy Sheriff, testified that he and Frank Cundiff had tested Mr. Buntin's Sixteen Gauge shotgun and fired a number of shells from the right barrel of the same at distances of 20 feet, 30 feet, 35 feet, 40 feet and 50 feet. Patterns revealed by these tests presented for the consideration of the jury were measured in pattern form disregarding the wide scattered shot. The pattern was described by the witness as averaging: 5½ inches at 20 feet; 9 inches to 9½ inches at 30 feet; 9 inches to 10 inches at 35 feet; 11 inches at 40 feet and 15 inches at 50 feet.

Investigating officers arriving at the scene of the homicide testified that it was a bright moonlight night and that they were able to recognize other persons at a distance of 30 feet or 40 feet. Officer Grau testified that defendant in describing the circumstances surrounding the shooting, stated that:

"Q. And do you recall what Mr. Buntin told him?

"A. He said that he (Buntin) had been awakened by a noise, I don't recall whether it was a dog barking or some other noise, but that he had gotten up and opened the door to his daughter's bedroom and had seen a shadow or a form in front of the screen in front of the window, and that at this he got his gun and stepped to the front porch and saw this boy on this make-shift scaffold or scaling device, and he said he told him to stay where he was at because he had a gun and that as he said this he jumped down and turned to run around the corner of the house and when he did he fired."

Officer Ramsey testified that defendant told him that when he, the defendant, open-

ed the front door of his house and walked on to the porch he saw the deceased on a make-shift ladder at the northeast corner of the house, outside his daughter's window, that the defendant lifted his shotgun and shouted "Stop, I have a gun", and that the deceased jumped from the ladder and ran and that while the deceased was running defendant shot him. Officer Ramsey further testified that when he asked the defendant for the gun, the defendant stepped inside the house and produced a sixteen gauge shotgun that had been recently fired.

The defendant accompanied Officers Grau and Ramsey to the police station and when he alighted from the car, according to the testimony of Sheriff Fowler, the defendant told the Sheriff, "Well, I finally got me a son-of-a-bitch." The defendant was questioned by Assistant County Attorney Swank where he made the following statement:

"State's EXHIBIT NO. 26
CASE NO. 3019                    (Transcribed 3–21–62)
GLENN PARROTT, Reporter

SOUNDSCRIBER STATEMENT

(Questions by David Swank)          (FLOYD ARTHUR BUNTIN)

———◆———

"Q   Will you state your name please, Sir?

"A   I am Floyd Arthur Buntin.

"Q   What is your address, Mr. Buntin?

"A   720 Willow Road, Stillwater, Oklahoma

"Q   And what is your age, Sir?

"A   My age is 50 years.

"Q   Now, Mr. Buntin, before we go any further on this statement I want to advise you of course of your rights. You don't have to make any statement to us at all, Sir.

"A   I am familiar with that legal requirement. I voluntarily make this statement.

"Q   Well, let me further advise you that you of course are entitled to an attorney at all times and that any statement you do make may be used against you in a trial. Being a Navy Veteran, you know that this is about the same requirement you have under the Uniform Code of Military Justice.

"A   I understand that.

"Q   Now, Mr. Buntin, I wish you would just start and tell us what happened this evening concerning this death which occurred out at your residence?

"A   Well, we went to bed about 10 or 10:30, at the usual time, and during there was considerable noise around the—there was some dogs barking—and my dog, which was sleeping in our bathroom barked some and I thought I heard a noise and I got up and looked around, in the house I looked around—I didn't turn on any lights—I just got up and looked around—and the wind was blowing and I went back to bed. I was there in bed a few minutes—three, five, or ten minutes, and I, I think the dog barked again and I heard some additional noise and I got up the second time and I looked out the window facing the lake, of the front room and didn't see anything and I went in my daughter's bedroom, which is a northeast room, second floor room. My daughter was sitting up in bed, just coming out of a sleep and rather frighten-

ed. The curtains on the windows were pulled and I heard a noise on the window. At first I thought it was probably the wind, but after a few seconds I had reason to believe that there was a person out there. I immediately left the room, got my gun and went to the front door, opened it, looked out and there was a man standing up on a ladder, trying to get into my daughter's bedroom through the window. I shouted at him to stop. He dropped to the ground, and as he dropped I raised my gun and in a split second, I fired. I aimed low, I thought I did, and he left and ran around the end of the house. I went down and saw he was lying there. I could hear him groan. I couldn't identify him but he looked—I was some distance and he groaned and I didn't identify him at the time, but I, when I looked at him I thought, perhaps, it was Jones. I went back in the house and called the police. I called them twice, and I called the ambulance.

"When they came after the second time and the police threw a light on the face of this man, it was Jay Jones. To the best of my knowledge that is the circumstances surrounding this case.

"Q Now, Mr. Buntin, where did you get the gun?

"A The gun is in my bedroom.

"Q And where are the shells—was the gun loaded at the time?

"A The gun was not loaded. The shells were on the chest by the gun. I loaded the gun before I went outside.

"Q Now, when you went out the door, you say this man was on this improvised ladder?

"A That is correct.

"Q And what did you say to him as you came out the door? Or as soon as you got out the door?

"A I opened the door and shouted 'Stop'.

"Q Now what did he do when you shouted 'Stop'?

"A He dropped to the ground. I think he started to drop to the ground as I opened the door, possibly. Going through the door and my shouting 'Stop' was a very little time interval there. It was practically done at one time.

"Q Now, as he hit the ground, his back was toward you, wasn't it?

"A As I remember, his left side was toward me.

"Q Were his arms raised?

"A No. They were not raised. As I remember it, I do not think they were raised.

"Q Now you stated you shot low—you actually aimed directly at the individual though, didn't you?

"A Well, I shot real rapidly and I was—I thought I was shooting low.

"Q You were aiming, even though shooting low, directly toward the person?

"A That is correct.

"Q Now was the man—uh—when he hit the ground, did his knees bend down, or was he standing erect and hit stiff-legged, or do you remember?

"A I don't remember that.

"Q Could he have been in a squatting position when you shot?

"A It is possible.

"Q Do you know?

"A No. I cannot say definitely.

"Q Immediately after you shot, he ran around the corner of the house then?

"A That is right.

"Q And did you come down off of the corner of your porch and go around the corner of the house?

"A I did.

"Q And your house is a split-level house, it is not?

"A It is equivalent to that, yes, it's a full basement house.

"Q And your front porch is actually on what we would normally call the second level?

"A As compared to where he was staying, it was on the second level, yes.

"Q And below your daughter's room was your garage?

"A That is correct.

"Q Now did he land—do you remember—on the north or the south side of this improvised ladder?

"A I believe—I can't say definitely—but I believe it was on the north side of it.

"Q That would put him actually right at the north edge of the house?

"A That is correct.

"Q As soon as you shot, he ran around the house, didn't he?

"A Yes, he did.

"Q And you came down off the porch and around the corner of the house?

"A That is right.

"Q Is that when you saw him lying on the ground?

"A Yes.

"Q Was he lying face-up or face-down, or on his side?

"A —pause— I don't remember. I believe he was lying on his side.

"Q Now, when the police came and you went back out, he was lying face-up was he not?

"A Uh — I think he was.

"Q When did you first recognize or believe it might have been Jay Jones that you had shot.

"A Well, around the corner was the first time, immediately after I had shot, as he was lying there, his profile, generally, as I approached him, led me to believe that it might be Jay. It looked like Jay— the back of his head.

"Q Did you tell your wife and daughter that when you went back to the house?

"A I think I did. I'm not sure.

"Q Did you recognize the boy possibly as Jay when he jumped down off the ladder?

"A No. I did not recognize the man at all.

"Q Now how long had—your daughter had gone with Jay, hadn't she.

"A She had dated Jay off and on for a period of a year or more.

"Q Now at first you had some trouble with your daughter and Jay dating, didn't you?

"A That is correct.

"Q And how long did that last, and what was the reason for it?

"A We—she was 14 years old—just about 15 at the time, and she was too young to date, in my opinion, and we told her that she couldn't date, but after a few months elapsed, we gave permission for her to date and he dated her and came to the house to pick her up and he had had dinner at the house and he was in the house many times.

"Q Have you talked to his father about his dating your daughter before?

"A At first, I called his father and asked him to have Jay not to date my daughter and he said that he would see that he didn't date her.

as she was too young and he would comply with my wishes.

"Q What grade is your daughter in school?

"A She is a Sophomore in High School.

"Q And Jay was a Freshman in College, was he not?

"A I believe he is a Freshman, I think he was going to school. I think he had a little more—I think he has had some previous college.

"Q When was the last time you saw Jay before tonight?

"A Oh, I suppose it has been a month or so ago.

"Q When was the last time he had a date with your daughter to your knowledge?

"A I think that was when he had a date with my daughter. He came and they had a date.

"Q Do you know what kind of a car Jay drove?

"A He did have an Oldsmobile, but he sold it, and I don't think he has a car now.

"Q Now, let's go back one more time to the actual shooting. How were you holding the gun when you fired the shot, Sir?

"A I believe that I just fired it from the hip, more or less.

"Q And you were aiming in a downward position from the porch to the first level of your house?

"A That is correct.

"Q What kind of gun was it, and what gauge was it?

"A A Sixteen gauge, double barrel shot gun.

"Q Do you know if it is a full choke or—barrel, or what?

"A The right cylinder is probably a full choke and the left one, I think is a straight bore, modified.

"Q Do you know what size shot was in the gun?

"A No, I don't. Probably six—I had a box of shells up there that I keep for hunting and it might have been sixes, probably were six shells.

"Q They were quite big loads, were they not? What we would call a heavy duck load?

"A I don't know. I loaded the gun in the dark.

"Q Now, when the boy hit the ground with his back or side toward you, did he start to move off in any direction?

"Q Now, I will repeat that question. Now when he started to move off and hit the ground, did he move off in any direction?

"A You mean after I shot, or before I shot?

"Q Before you shot?

"A Well, at the time that I shot, he was standing with his left shoulder to me, standing on the ground, as I remember it. It was—he dropped to the ground and I opened the door and it was all done in a split second, I don't know just exactly where he was.

"Q Actually then, you shot just about the instant he hit the ground?

"A About that.

"Q Before he had actually had a chance to move in any direction? Is that right?

"A Well, I think he was on the ground, with his left shoulder towards me, and I shot from the hip.

"Q He was not running toward you, or away from you?

"A No. He was standing in a stationary position.

"Q He was just standing still?

"A If you can stop motion in that split second, I would say he was standing still.

"Q And the instant you shot, though, then he ran around the house?

"A Yes.

"Q If you did believe it was Jay, Mr. Buntin, and you had shot him, why didn't you go to his aid?

"A I didn't—when I looked around the corner—the back of his head and the way he was lying there—I thought, 'That looks like Jay', so I immediately ran to the phone, called the police and called the ambulance. My wife and daughter was hysterical and I waited a few minutes and I called again.

"Q Didn't you think you might have been able to give him some aid, if it had have been Jay Jones?

"A No. I don't think I could give him any aid, under those conditions.

"Q Did you know where you had hit him when you went around the house?

"A Uh, I didn't think I had hit him when I had shot, but of course he was lying on the ground when I went around the house.

"Q Did you check to see where you had hit him?

"A No. I didn't check at all. I ran to the phone and called the ambulance and the police.

"Q How close to the body did you get?

"A Oh, I suppose 5 or 10 feet, I just topped the corner of the house and he was groaning and I knew that he was shot and so I ran to the phone.

"Q His body was lying at the northwest corner of the house with his head toward the west and his feet back toward the east, is that correct?

"A That's right.

"Q And I would say approximately 4 to 5 feet out from the edge of the house?

"A I think that's about right.

"Q Is there anything else, Mr. Buntin, that we haven't asked you about this, this evening, that you can think of, to tell us?

"A No. I can't think of anything in this particular case.

"Q Mr. Buntin, I believe that will be all then, this evening. This statement has been completely voluntary on your part?

"A This statement is completely voluntary on my part and to the best of my belief it is true, however, things happened so fast there could be a sight error in my evaluation of some of my statements. The time element, I might add, I don't believe I stated here at this time, when I went into my daughter's room, she was sitting up in bed, frightened at the noise. She was just coming out of a sleep and was in a frightened sleep afair, and the curtains were pulled over the windows, and once after I had come to the conclusion that there was maybe somebody outside, I thought it best not to pull those curtains with my daughter there in front of that window.

"Q Did you think to have your daughter leave the room, and do it?

"A No. I just ran and got my gun and went to the front door. She was in a sleepy—a drowsy sleep—and it would have taken considerable time to have gotten her out of that room.

"Q How were you dressed at the time, Sir?

"A   In my underwear—I think—I am sure.

"Q   You dressed after you called the police, then?

"A   That is correct.

"Q   I think that is all tonight, then, Mr. Buntin, on this statement.

"(END OF STATEMENT) EMS"

From the record it appears that the measurements and elevations at the homicide scene were as follows:

From the front door, facing east, to the northeast corner of the Buntin home, the measured distance was 33 feet 8 inches. The scaffolding consisted of a bench, bale of hay and two 2×6 boards extending from the ground level to a height of 3 feet 3 inches below defendant's daughter's window.

From the ground level to the eaves at this point was a distance of 15 feet 9½ inches. The length of the eaves at this point where the scaffolding was erected was 2 feet, and that the elevation of the porch from which the defendant stated the fatal shot was fired, was approximately 7 feet higher than the ground level at the point at which the scaffolding was erected.

Dr. H. S. Mendenhall, professor of Mathematics and Astronomy at Oklahoma State University, testified that on the evening of March 20, 1962, at 11:45 P.M. the moon was full and at an altitude of 55 degrees perpendicularly above the horizon and 23 degrees east and south in Azimuth and would cast a shadow on this house of 7 feet 3 inches from the eaves straight down along the east side of the house. From the measurements of the house and eaves and the location of the moon it was determined there would be a shadow of 2 feet 3 inches below the window sill.

The testimony of John Loren Jones, father of the deceased was partially as follows:

"   *   *   *

"In January of 1961 is the first time I had any knowledge of the Buntins.

*   *   *   *   *   *

"Well, Jay was home on leave from the Army and was out on a date and we were sitting up waiting on him to come in, he was expected in about 12:00, and we were watching television when the phone rang and we got a call from the Buntins and they wanted to know if our boy was in town, so we said 'Yes, he was home on leave', and they asked if we knew where he was and I said 'Yes, he has gone into town to go to a movie with some of the Chesbro boys', and they said 'Well, our daughter is missing and we think she is with Jay, we have just gone to check on her and she must have slipped out through a window, we don't know how she got out'.

"MR. YORK: Now, just a minute, may I ask who were you talking to, Mr. Jones?

"THE WITNESS: Well, which person at the moment I was talking to I don't recall, I talked to both Mr. and Mrs. Buntin on the phone.

*   *   *   *   *   *

"Q   Did more than one of them talk on the phone to you on that occasion?

"A   I believe that is true, yes, I talked to both of them.

"Q   All right, now, would you proceed —did they tell you that they thought she had gone out the window?

"A   Yes, they said they didn't know how she got out, but that when they had gone to check on her, I believe they said the doors were latched and they didn't know how she got out unless she slipped out through a window.

"Q   Then what happened.

"A   I said that I hadn't known that Jay was acquainted with Patty or was dating Patty, that I had no reason to believe that he was with the girl, and they said 'Well, they had known each other since last summer out at the lake and we have had some trouble with them trying to see each other,

we have forbidden Patty to see Jay', and that's about the most of the conversation, I told them I didn't know where I could go and find Jay but that if I could I would, and that just as soon as they heard anything would they please call me back and that I would do the same for them, and Mrs. Jones and I then discussed it and were concerned about it, and about fifteen minutes later, why, they called back again.

\*　\*　\*　\*　\*　\*

"\* \* \* the second call, saying that Patty had just walked in or strolled in.

"Q　And who made that call?

"A　I believe this was Mr. Buntin only this time, and he said that she had mud. on her, and I said 'Well, was she with Jay'? and he said 'I don't know, she won't tell us where she was or who she was with'. \* \* \*

"\* \* \* Then it was the next day— this would have been, I think, on Monday, that I called Mr. Buntin, and this, I believe, was while he was at the store, and I asked him first 'Did Patty tell you where she was last night?', and he said 'No, she has not, we haven't pressed it further', and I said Well, Jay has admitted that he was with Patty that night and that he helped her slip out and that I had talked with Jay about it and had impressed him with the seriousness of the situation, and I don't think we're going to have any more trouble with Jay', and I was very hard with the boy, and he said at that to me 'I hope that you have done a good job of impressing him' or 'I hope you have impressed him well because I will not stand for him to date Patty, him or any other boy', \* \* \*

\*　\*　\*　\*　\*　\*

"Q　Now, when was the next contact with the Buntins?

"A　\* \* \* but the next conversation I had with the Buntins about this was back down in May, and this would have been four or five months later, just before we were getting ready to go to Indiana University for a year of study, and I went to see Mr. Buntin at the store \* \* \* this is the first time I had met him personally \* \* \* just the two of us were in the store, 'I am Jay's father, and I am here to let you know that we have done all that we can to make Jay aware of the situation', and I said 'I have put some heavy restrictions on the boy, I have threatened to take his car away from him, I have threatened to take him out of college', he was to stay and go to college this summer, 'And I have threatened to take his money away from him, if he continues to try to see Patty, and I hope you will put a similar restriction and I hope that you will also control Patty's activities so that we won't have this trouble', and. he said 'Well, I don't know what I can do', he said 'She lies to us, she slips out of the house on us, I can't control the girl, I can't follow her around all day, and the worst time is after school.' He said 'We are here trying to make a living and we just can't watch her every minute of the day', and he said 'But I want you to know that I will not stand for Jay or any other boy to have dates with my daughter, and if I hear of Jay or any other boy coming around, I'll make them wish they hadn't'.

"Q　Was that the end of your conversation?

"A　No, I quickly told Mr. Buntin that if he did have any trouble with Jay to please call the law, and I also asked him to write my name and address down where I would be in Indiana so that he could call me if there was any further trouble, and he took a book out from underneath his cash register, some kind of an account book, and wrote my name and address where he could reach me up at.

Indiana University, and he promised that he would call me if there was any more trouble, and this was the end of that conversation, and the next thing I knew we were notified of Jay's death."

Jim Bohanon, friend of the deceased testified that about two weeks before the fatal shooting the deceased had told him that he knew that Mr. Buntin had a gun in his house, and he told him that he was afraid to go out there because he knew he would shoot him if he got a chance.

The defendant testified in his own behalf that on the evening of March 20, 1962, he was at home with his family, retired at about 10:30 in the evening; that at sometime thereafter he was awakened by the sound of a barking dog and that he got up and checked the house, looked outside and returned to his bed, and that a few minutes thereafter he heard noises outside the house and a dog barking and got up to investigate and that when he entered the bedroom of his daughter, Patricia, which is on the northeast corner of the house, she was sitting up in bed half awake and frightened; that he heard noises outside her window and observed the silhouette of a man. That he returned to his bedroom, loaded his sixteen gauge shotgun and clad only in his shorts and without putting on his prescription glasses, proceeded to the front door of his home and upon emerging therefrom described the incident in the following language:

"A   I stepped through the door and as I stepped outside there was a man on an improvised ladder working at the window at the northeast corner of the house at Patty's bedroom, and I said 'Stop, I have a gun', and he remained there a second or two and then he swung off and jumped; the gun was just hanging in my arms at my hips, and I shot low under him and he ran around the house.

"Q   Now, Mr. Buntin, when you said 'Stop, I have a gun', what exactly did the man on the scaffold or ladder do?

"A   He remained there for a second or two, perhaps three, but just a brief time, and then he swung off with his left hand and swung his right hand toward me and I was afraid he had a pistol in that hand, I could not see his right hand, but he moved his body to the left and then he jumped backward and went to the ground.

"Q   When, if you know, did you fire the gun in relation to his jumping motion?

"A   Well, I fired under him as he started to jump, and there is some very close time to that—he started to jump and I realized that he might have a gun in his hand and I was frightened, and I wanted him to remain where he was and I shot a warning shot under him and he ran around the house.

"Q   Did you intend to shoot the man?

"A   No, Sir, I did not intend to shoot him.

"Q   What did you intend to do, Mr. Buntin?

"A   My intentions were to hold that man on the ladder as he was until the police came.

"Q   Mr. Buntin, after the man ran around the corner of the house, what then did you do?

"A   I went down the front steps to the east and around the corner of the house, and there I saw a man lying on the ground. It was in the darkness, I could not identify him and I went up to within five or ten feet of him, and I heard him breathing real deeply or groan, I don't know, but the silhouette of his body on the ground had an appearance of Jay Jones.

"Q   Then what did you do, Mr. Buntin?

"A   I then immediately returned to the house and my wife had called the police, and then I went to the bedroom and dressed and then I called the police and the ambulance again."

The defendant testified that when his daughter Patricia was fourteen years old she met the deceased, Jay Jones, and had slipped out to date him on several occasions without consent. He admitted that he had had a conversation with Mr. John Loren Jones, father of the deceased, but denied ever having threatened the deceased in any way. He specifically denied ever making the statement to Sheriff Fowler that "Well, I finally got me a son-of-a-bitch". Defendant testified that he first met the deceased on or about his daughter's fifteenth birthday, and that he had agreed to allow them to date Friday and Saturday nights but no later than midnight hour. He testified that Jones was a pleasant young man, very courteous and that when he, Jones, visited in the Buntin home two or three times a week, the relationship had been cordial. He testified that Jones had visited with them on sundry occasions and had eaten with them several times, including the previous Thanksgiving. The witness stated that during the previous summer, deceased and his daughter Patty, had gone together fairly steady but that since Christmas, Patty had been dating other boys and had last seen the deceased in the Buntin home a few weeks prior to the evening of March 20, 1962. The witness reiterated that he had worn prescription glasses for a number of years but had not been wearing them at the time of the fatal shooting.

Mrs. Buntin's testimony was in substantial accord with that of her husband, except that she did not witness the shooting. She stated that she saw the flash of the gun through the window but did not see her husband fire it, or the position of the deceased when the gun was fired.

Patricia Buntin testified that she met the deceased in the summer of 1960 and that she had slipped out to date him without her parent's consent on numerous occasions, but that her parents had found out. She testified that when she became fifteen her parents permitted her to date the deceased and that he was a frequent visitor in their home until December 1961. Thereafter,

that they dated less frequently and she dated other boys. She testified that she had last communicated with the deceased on Sunday, the 18th of March, 1962, at which time she advised him that she did not want to see him again.

The testimony of Dr. Buel J. Staton was substantially that, on the 12th of October, 1962 (subsequent to the homicide here involved) he administered the Snellen's test (subjective vision test) to the defendant and that the defendant's right eye had a vision range of 20/200 and his left eye had a vision range of 20/70, and that the combination of vision ranges in this instance would be that of the good eye, as that became the dominant eye, or a combined vision range of 20/70.

The testimony of Dr. William L. Hughes, instructor at the Oklahoma State University, after having been qualified as an expert was that on a moonlight night under ideal conditions, the lumen of light per square foot was .004 to .005, or approximately 1,000 times less than the lumen of light during the daylight hours. He expressed the opinion that it would have been impossible for a person with 20/70 vision to recognize another at a distance of 35 feet in the moonlight.

At the conclusion of the evidence the trial court carefully and meticulously instructed the jury, and the court's instructions, although objected to by the defendant, when considered as a whole, fairly and fully stated the law applicable to the facts in the instant case and presented to the jury for their consideration a determination of fact.

■■ Under the circumstances here presented and the facts as above set forth, we are of the opinion that the evidence, although conflicting, is ample to support the verdict of the jury and we will here follow the rule enunciated in Pierce v. State, Okl. Cr., 371 P.2d 924 that:

"In murder prosecution, where there is competent evidence in the record from which the jury could reasonably

conclude that defendant was guilty of manslaughter in first degree, Court of Criminal Appeals will not interfere with verdict, even if there is sharp conflict in the evidence and different inferences might be drawn therefrom, since it is the exclusive province of the jury to weigh the evidence and determine the facts."

In their briefs and oral arguments before the court, counsel for the defendant urge that the trial court committed reversible error in the following instances: (1) In admitting photographs of the gunshot wounds inflicted on the body of the deceased which pictures were taken at the funeral home, and (2) introduction into evidence the clothing worn by the deceased on the evening of the homicide. In support of this assignment of error the defendant relies upon Archina v. People, 135 Colo. 8, 307 P.2d 1083 (Colo.1957). In the Archina case in the body of the opinion the Colorado court stated:

"The two pictures of the naked body of Mary Macri Archina, taken at the morgue 17 days after the shooting showing the results of extensive surgery performed after the shooting, are clearly inadmissible. The pictures do not prove or tend to prove any issue in the case. It may be suggested they prove the nature and extent of her injuries—they do not, but rather prove the handiwork of surgeons who, in their efforts to save her life, had largely covered up evidence of the handiwork of the defendant. These pictures do not portray anything that occurred at 3949 Tejon Street. There are several good word pictures in evidence of the scene at the Tejon Street address—several witnesses testified that Mary was propped up against the wall in the bedroom moaning, her stomach shot away by the defendant, holding her intestines in her hands. That is certainly a horror picture, a true one, that is inextricably interwoven with the offense for which the defendant was tried; the defendant participated in creating that scene of death, destruction and desolation; evidence thereof is admissible, the defendant must answer for it and explain it away if he can. On the contrary, he had nothing to do with the scene at the Denver morgue 17 days later and he is not answerable for it and necessarily cannot explain it away.

"None of these pictures is admissible, they are without probative value, they serve only to incite the jurors to passion, prejudice, vengeance, hatred, disgust, nausea, revolt and all of the human emotions that are supposed to be omitted from the jury's deliberations. Their admission was highly prejudiced and calls for a reversal."

Defendant further relies upon the case of Oxendine v. State, Okl.Cr., 335 P.2d 940. In the Oxendine case syllabus read as follows:

"In prosecution for murder, the showing of colored photo slides on screen to the jury, of victim's nude body as it appeared at the morgue after extensive autopsy surgery had been performed, in view of testimony that victim died instantly as the result of gunshot wounds, was prejudicial error, since they had no probative value in establishing any issue in the case, but were a mere appeal to passion and prejudice the jury.

"If the principal effect of demonstrative evidence such as photographs is to arouse the passion of the jury and inflame them against the defendant because of the horror of the crime, the evidence must be excluded.

"On the other hand, if the evidence has probative value with respect to a fact in issue that outweighs the danger of prejudice to the defendant, the evidence is admissible even if it is gruesome and may incidentally arouse the passions of the jury.

"Where defendants admit all the allegations of the charge and no contro-

versy exists as to the cause of death, weapon used, extent of wounds, location or any other material issue, it was error to exhibit such photos to the jury."

We are in accord with the Oxendine case and the Archina case but are of the opinion that the facts in the instant case are clearly distinguishable from them. In both the Archina and Oxendine cases the photographs were taken after extensive surgery had been performed on body of deceased. Such photos did not tend to prove or disprove any fact or issue presented for the consideration of the jurors. In the instant case, however, while admitting the slaying, the defendant urged in his trial and on appeal that the killing was justified, (1) Because he was acting in necessary defense of his home, (2) That he was acting in self defense and in defense of others, and (3) That it was necessary in making a lawful arrest for a felony committed in his presence

Photographs indicate that all of the shots entered the body of the deceased on a flat horizontal plane and that he had been shot in the back. This tends to negate that the homicide was committed in necessary self defense and was properly admitted for the jury's consideration in arriving at a determination of the defendant's guilt or innocence. Moreover, the pictures were not taken after extensive autopsy surgery and were not gruesome.

■■■ We therefore hold that where, as in the instant case:

"* * * a photograph is shown to be a faithful reproduction of whatever it purports to reproduce, it is admissible in evidence, as an appropriate aid to the jury in applying the evidence and this is equally true whether it relates to persons, things, or places.

"Although it is error to receive in evidence gruesome photographs of a homicide victim, designed primarily to arouse the passion of the jury, such photographs are admissible; when they are relevant to the issues before the court and their probative value is not outweighed by the danger of prejudice to the defendant." See Pate v. State, Okl.Cr., 361 P.2d 1086, and cases cited therein.

■■■ We are of the further opinion that the admission into evidence of the clothing worn by the deceased on the night of the homicide was merely cumulative of evidence previously introduced tending to establish the point of entry of the shotgun pellets into the body of the deceased and that their admission was not prejudicial to the accused.

It is next contended that error prejudicial to the accused was committed when Sheriff Charlie Fowler stated:

"Q  Where was Mr. Buntin at that time?

"A  He was in the police car, I followed the police car in from Cypret's Corner, this 'Y' out north of Stillwater, and when we got down here I was directly behind him and I got out of my car when he got out of the police car, and he turned around and recognized me and he said *"Well, I finally got me a son-of-a-bitch"*. (Emphasis supplied)

■■■ Counsel argues that the sheriff's statement as above set forth was not responsive to the question propounded. We observe, however, that after a careful examination of the record that no objection was interposed to the statement of Sheriff Charlie Fowler, and that counsel in his cross examination of this witness inquired into the circumstances surrounding this statement and we are of the opinion that this assignment of error is not properly before us on this appeal for we have repeatedly held that:

"Errors to which no exceptions were taken will not be considered on appeal unless they are jurisdictional or fundamental in character." Gant v. State,

Okl.Cr., 377 P.2d 603; Williams v. State, Okl.Cr., 373 P.2d 85.

In order to understand the next assignments of error we must again refer to the record. After the court had instructed the jury counsel for state and defendant presented their closing arguments. (not reported in casemade). The case was submitted to the jury and the following proceedings were held outside the jury's presence:

"MR. YORK: Comes now the defendant and shows to the Court that during the closing argument of the Assistant County Attorney, Mr. David Swank, he expressed his opinion on the guilt of the defendant by stating that the County Attorney—in substance he said that the County Attorney's Office thought that the defendant was guilty of murder, and that he was guilty of murder, and that the facts and circumstances showed that he was guilty. Now, is that about what you said, David? Would you say that is substantially correct?

"MR. SWANK: I believe that is substantially it.

"THE COURT: As I understood the remarks, that not only himself but the Sheriff, I believe, were of the opinion that the defendant was guilty.

"MR. YORK: Well, on the basis of those remarks, the defendant now moves the Court to grant a mistrial in this case.

"THE COURT: I will take it under consideration, and I'd like to see some briefs on it.

\* \* \* \* \* \*

"THE COURT: Let the record show defendant's motion for a mistrial is overruled.

"MR. YORK: Exception"

It is not entirely clear when the trial court gave the Supplemental Instruction #16–A, but from the statement of counsel presented on Motion for New Trial, the time is fixed at two hours after the case

was submitted to the jury. Instruction #16–A as given to the jury was given to the jury in the following language:

"Ladies and Gentlemen of the Jury:

In the closing argument of the Assistant County Attorney, Mr. David Swank, to the jury, he stated in substance that in his opinion and in the opinion of the Sheriff the defendant was guilty of murder, or words to that effect.

You are now told that the private personal opinions of the Assistant County Attorney or the Sheriff are not evidence in this case and are not proper for your consideration. So, therefore, the Court instructs the jury not to consider any such statements of private personal opinion that may have been made by the Assistant County Attorney during his final argument.

Defendant excepts to the giving of this instruction for the reason that it was given about 2 hours after the Jury had already begun its deliberation and had taken one ballot.

Leon J. York & D. W.
Attorneys for defendant
Exception allowed. /s/ R. L. Hert
Dist. Judge"

Thereafter, the defendant sought to secure a Bill of Exceptions from the trial court and hearing was held on the 4th day of January, 1963, and the following proceedings were held:

"THE COURT: Let the record show this matter comes on for hearing on the Motion for New Trial and the Supplement thereto, and the Application for Bill of Exceptions.

"MR. YORK: If it please the Court, this Application for Bill of Exceptions goes to that part of the argument made to the jury by the Assistant County Attorney, David Swank, on which no record was made. Now, we did make a record regarding some of the things he said, and this was the statement he made in substance: 'That the defend-

ant was guilty of Murder in his opinion and in the opinion of the Sheriff'; Now, he said something else which was more fundamental than that, he stated—and this is the basis for the Application for Bill of Exceptions—he stated that Patty Buntin told him the night he was out there to investigate this matter that she always kept the blinds or the shades up and that they were up that night. Now, he made that statement in substance, and it was supported by an affidavit of Mr. Worthington, and we would like to have the record show what he did say. Now, here is what Mr. Worthington says in his affidavit: 'That during the final argument the Assistant County Attorney stated that Patricia Buntin had told him that as her father ran around the house he said "Stop, or I'll kill you" '. Now, this statement was not in evidence, although the County Attorney has laid the predicate for impeachment purposes by asking Patricia Buntin while she was on the witness stand, and that statement was not made. David Swank did not take the witness stand as a witness and was not sworn as a witness, but he made this statement during his final argument to the jury. Now, as I recall, he asked her on cross examination if she didn't make that statement, and she said 'No', and then he stated in his closing argument that that was the statement she did make, and on that particular point that's all I have to say.

"Does the County Attorney have any response to it?

"MR. STEAD: Well, there wasn't any record made of the final argument, and it is not our remembrance that any such statement was made. The Assistant County Attorney did comment on the fact that Miss Buntin refused to answer the question, but it is not our remembrance that the Assistant County Attorney made the statement in the manner and in the style in which it is set forth in this Application, and it is merely a comment about her refusal to answer.

"THE COURT: Do you deny that the statement was made in the manner set forth in the affidavit?

"MR. STEAD: Yes, we deny that the statement was made in the manner set forth in the affidavit.

"MR. YORK: Well, we have the statement here of Mr. Worthington, the sworn affidavit, and I can remember very distinctly that he made that statement.

"THE COURT: Did you want a ruling on the Application for Bill of Exceptions?

"MR. YORK: Yes, at this time I want that ruled on.

"THE COURT: Very well, in the absence of a record having been made regarding this matter and the Court having no independent recollection regarding the same, the Application for Bill of Exceptions is denied, with exceptions allowed.

"MR. YORK: Let the record also show that David Swank, the Assistant County Attorney, is now present in the courtroom and he has not denied making the statement.

"Then the Court denies the Bill of Exceptions?

"THE COURT: Yes, and you may have an exception to the ruling. Now, I will hear anything you have to say in support of your motions for a new trial."

It is first urged by the defendant that:

(A) The trial court erred in refusing to grant a mistrial when, after the case had been submitted to the jury, the defendant moved for a mistrial on the grounds that the Assistant County Attorney had expressed his opinion and that of the sheriff's as to the guilt of the accused during the unreported closing argument.

(B) It is further urged that the court erred in giving Supplemental Instruction #16–A as above set forth over the objection and exception of the defendant.

(C) That the trial court erred in refusing to grant a Bill of Exceptions.

We are of the opinion that the assignments of error A, B and C are without merit for we have consistently held that:

"Ordinarily error cannot be predicated upon mere unexplained excerpts from the remarks of counsel to the jury. Enough must appear of record to advise the appellate court of what preceded the alleged objectionable remarks and their meaning to be deduced from the context, and whether or not they were invited or provoked by remarks made by opposing counsel." Cody v. State, Okl.Cr., 376 P.2d 625.

In the instant case there is nothing before us to indicate that at the time the alleged improper remarks were made during the closing argument, that an objection was interposed to them or a request made that the jury be admonished to disregard them, but to the contrary it clearly appears that objection to the prosecutor's closing remarks were made only after the jury had retired to deliberate. The court at that time, and prior to the time the jury arrived at a verdict, properly admonished the jury to disregard such remarks and from the jury's verdict finding the defendant guilty of the included offense of Manslaughter in the First Degree, and fixing his punishment at imprisonment in the State Penitentiary at a term of only four years, it is readily apparent that the remarks, if made, did not prejudice the jury against the accused.

For a comprehensive analysis of cases involving alleged improper remarks of the County Attorney, see Young v. State, Okl. Cr., 373 P.2d 273.

In view of the failure to preserve a record of the prosecutor's closing argument and the court's instruction #16–A, we are of the opinion that the court did not err in failing to grant a Bill of Exceptions.

For all of the reasons above set forth, the judgment and sentence appealed from is affirmed.

JOHNSON, P. J., and NIX, J., concur.