22CA1585 Peo v Derossett 06-25-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA1585
Jefferson County District Court No. 20CR4
Honorable Diego G. Hunt, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Stephen Douglas Derossett,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE FREYRE
Brown and Schutz, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced June 25, 2026

---

Philip J. Weiser, Attorney General, Brenna A. Brackett, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Meredith K. Rose, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Stephen Douglas DeRossett,[1] appeals the judgment of conviction entered on a jury verdict finding him guilty of second degree murder.  We affirm the judgment.

## I.    Background

¶ 2    DeRossett and the victim, Keli Jackson, began dating in July 2019.  In October, DeRossett moved into Jackson's house.

¶ 3    On January 1, 2020, at around 11 a.m., DeRossett called 911.  At the beginning of the call, Jackson can be heard saying, "Hurry, I'm going to die."  Out of breath, DeRossett requested an ambulance.  DeRossett said that Jackson had too much to drink and that she started "coming at him," so he pushed her down the stairs.  He then said that Jackson kept trying to hit him and that she had a knife.  When the dispatcher asked DeRossett if Jackson cut him, he responded that he didn't know because it happened so fast and that his face hurt but that he didn't know if it was bleeding.  When asked for the second time if Jackson cut him, DeRossett responded, "[Y]es," but then said that he had blood all over him but didn't know what happened.  DeRossett then

_____

[1] The briefs sometimes style DeRossett as "Derossett."  We follow the style in the opening brief.

mentioned that Jackson was bleeding. Three and a half minutes into the call, DeRossett told the operator that Jackson was having a hard time breathing.

¶ 4     Later in the 911 conversation, DeRossett stated that Jackson came at him with the knife, he took the knife from her, he told her to get the hell away from him, and he called 911. A minute later, DeRossett stated that the two were taking shots, Jackson started acting weird, and then she began swinging at him. DeRossett said he did not know what he did, but then Jackson grabbed the knife, and he ended up covered in blood. When DeRossett said that Jackson was not moving, the operator asked him if Jackson was breathing, and DeRossett responded that he didn't know and that he didn't do anything.

¶ 5     When paramedics arrived, Jackson was lying in a pool of blood, was unconscious and unresponsive, had no pulse, and was not breathing. She was declared dead at the scene. Police found a knife with blood on it on a nearby couch. The knife had DeRossett's name engraved on its blade.

¶ 6     Following an autopsy, the forensic pathologist, Dr. Dawn Holmes, concluded that Jackson died of blood loss from a total of

fifteen stab wounds. The autopsy revealed multiple sharp-force injuries including both stab wounds (deep, sharp-force injuries) and incised wounds (more shallow, sharp-force injuries), as well as abrasions and bruises. Dr. Holmes testified that four of the stab wounds were lethal, meaning that they were wounds that entered a vessel or an organ and were capable of causing death.

¶ 7 While paramedics tried to revive Jackson, DeRossett was escorted outside to the driveway. DeRossett told a responding officer that he and Jackson had been drinking and that Jackson was acting silly. DeRossett then said that Jackson came at him and that he did not know what happened after that. After DeRossett complained of chest pain, he was placed in an ambulance. While in the ambulance, DeRossett repeated that Jackson was acting silly, that she came at him with a knife, and that he did not know what happened.

¶ 8 Following treatment at the hospital, DeRossett was taken to the police station. There, he told another police officer that he could not believe the situation he was in, that he was just trying to help Jackson, and that he was trying to defend himself against her. He also said that he "was in a daze, and that he just recalled seeing

3

her hair flying about, and then she was sitting down, and that's when [he] noticed the blood." DeRossett had scratches on his face, on both sides of his nose, on the underside of his chin, and on his chest, as well as scratches on his lower back, left wrist, right pinky finger, and right forearm. DeRossett also had "what appeared to be rug-burn-type injuries" on each knee.

¶ 9 DeRossett's blood was drawn at the hospital, and an extrapolation analysis indicated that his blood alcohol level was around 0.116 at the time he called 911. The analysis also showed DeRossett had THC in his blood.

¶ 10 The State charged DeRossett with first degree murder and two crime of violence sentencer enhancer counts. DeRossett asserted self-defense. Alternatively, he argued that he lacked the requisite mental state for first or second degree murder due to a combination of factors, including his intoxication at the time of the incident and the lasting effects of a previous brain injury.

¶ 11 The jury acquitted DeRossett of first degree murder but found him guilty of second degree murder and the two crime of violence counts. The court sentenced him to forty years in the custody of the Department of Corrections.

¶ 12    On appeal, DeRossett contends that the trial court erred by (1) admitting thirty-three photographs of Jackson's dead body; (2) permitting a psychologist's opinion that DeRossett had aspects of three different personality disorders offered to rebut defense evidence that a prior traumatic brain injury affected DeRossett's mental condition at the time of the killing; and (3) denying DeRossett's tendered instruction on mental condition evidence without offering an alternative under section 16-8-107(1)(a), C.R.S. 2025. DeRossett also asserts cumulative error. Although we identify some errors, we conclude they are harmless and affirm the judgment.

## II.    Photographs

¶ 13    DeRossett contends that the trial court reversibly erred by admitting thirty-three photographs of Jackson's dead body. We agree that many of the photographs were unnecessary and cumulative but conclude that the error in their admission is harmless and does not require reversal.

## A. Additional Background

¶ 14    On the fourth day of trial, the prosecution moved to introduce thirty-three autopsy photographs.  DeRossett's counsel objected to the group as a whole, arguing,

> Every single one of these are autopsy photos. . . .  I understand the prosecution introduces some exhibits on the autopsy, but I think this is cumulative, prejudicial, and whether intended or not . . .
>
> . . . .
>
> [h]as the effect of inflaming the emotions and passions of the jury because of the . . . graphic nature of these photos. . . .  [I]n going through these photos quickly, I don't think they need all of them.
>
> . . . I do understand that they're going to have the pathologist testify.  The pathologist can be referring to some of the photos, but this is just overwhelming evidence . . . that's of an emotional nature.
>
> So based on Mr. DeRossett's state and constitutional rights to a fair trial, right to effective assistance of counsel, right to a fair jury, I'm objecting to all of these photos being admitted.
>
> If . . . there's a culling of the photos, I understand, . . . some are going to be admitted, but this massive number of photos and given the graphic nature of these photos, I am objecting based on the legal principles I've cited.

6

¶ 15     When the trial court asked DeRossett to identify the specific photos he believed were cumulative, DeRossett listed the following exhibit numbers: 114-117, 119, 122, 124, 126, 127, 129-132, 142, and 144.  The prosecution responded:

> We already have culled down the photographs that the People anticipated admitting from the multitude of photographs that were taken at the autopsy.
>
> The People don't intend to publish any of these through [the crime scene analyst], but through Dr. Holmes, and she would be testifying specifically to each one with regard to the . . . injuries that are seen.
>
> As described in the exhibit list, these are not cumulative, as the Court has even stated. There could be close-ups, different angles. That does not render them cumulative.  So the People would . . . request that the objection is denied.
>
> This is relevant evidence pursuant to [CRE] 401. . . .  [I]t may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice; we do not have that here.

¶ 16     After confirming with the prosecution that Dr. Holmes would be referencing each of the exhibits individually in her testimony, the trial court overruled DeRossett's objection.

¶ 17    During Dr. Holmes' testimony, she explained Jackson's various stab wounds, abrasions, and bruises as the prosecution showed the autopsy photographs.  At one point, when identifying a lethal stab wound, Dr. Holmes commented that the wound could be seen better in a different photograph.

¶ 18    After the introduction of nine of the photographs, DeRossett renewed his objection.

> I want to renew my objection with respect to these photographs, the cumulative nature of these photographs, and the . . . emotional and impassioned prejudice that they create.
>
> Even Dr. Holmes when she was testifying was referring to certain photographs saying, "Actually the other photograph was a better version," and so . . . each individual photograph is not representing a different injury for Dr. Holmes' testimony.  In fact, she's even said that certain photos are not as helpful as other photos.  So I just want to renew that objection that I made earlier.

¶ 19    The trial court responded:

> All right.  And I will note that Mr. DeRossett is . . . the individual who is reacting emotionally to — at least visibly to the exhibits, and the witness was indicating a prior exhibit was more helpful to illustrate her testimony concerning a particular injury.

> However, she did give testimony with respect to the exhibit that was referenced, and by the People, that was an earlier exhibit which was given in the course of her testimony. So I . . . don't find it to be cumulative.

¶ 20    Dr. Holmes then resumed her testimony.

### B. Standard of Review and Applicable Law

¶ 21    "We review a trial court's evidentiary rulings for abuse of discretion." *Nicholls v. People*, 2017 CO 71, ¶ 17. "A trial court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or when the trial court misapplies or misconstrues the law." *Fisher v. People*, 2020 CO 70, ¶ 13. Under this standard, "we ask not whether we would have reached a different result but, rather, whether the trial court's decision fell within the range of reasonable options." *People v. Archer*, 2022 COA 71, ¶ 23 (quoting *Hall v. Moreno*, 2012 CO 14, ¶ 54). We review a preserved evidentiary error under the nonconstitutional harmless error standard. *Hagos v. People*, 2012 CO 63, ¶ 12 (requiring reversal only if the error substantially influenced the verdict or affected the fairness of the trial proceedings).

¶ 22    In general, all relevant evidence is admissible. CRE 402. Evidence is relevant if it tends to make the existence of any fact of

consequence to the determination of the action more probable or less probable than it would be without the evidence.  CRE 401.

¶ 23     Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.  CRE 403.  Evidence is considered unfairly prejudicial if it has an "undue tendency to suggest a decision on an improper basis . . . such as sympathy, hatred, contempt, retribution, or horror."  *People v. Clark*, 2015 COA 44, ¶ 18 (citation omitted).  In reviewing a trial court's determination under CRE 403, "we assume the maximum probative value that a reasonable fact finder might give the evidence and the minimum unfair prejudice to be reasonably expected."  *Clark*, ¶ 18 (citation omitted).

¶ 24     In general, photographs "may be used to graphically portray, among other things, the scene of a crime, the identification of a victim, the appearance and condition of the deceased, and the location, nature and extent of the wounds or injuries, all of which matters are relevant."  *Young v. People*, 488 P.2d 567, 574 (Colo. 1971).  "Photographs of victims illustrating the appearance of the victim's body at the scene of the crime or the nature and location of

the victim's injuries are generally relevant because they tend to show whether and how the offenses were committed." *People v. Herrera*, 2012 COA 13, ¶ 34; *see also People v. Mattas*, 645 P.2d 254, 260 (Colo. 1982) ("It is within the trial court's discretion to decide whether photographs are unnecessarily gruesome or inflammatory, and the court's decision will be reversed only upon abuse of that discretion."). The trial court must "exercise its discretion and weigh the probative value of this evidence against its inflammatory effect" when determining whether to admit such photos. *People v. Zekany*, 833 P.2d 774, 777 (Colo. App. 1991).

¶ 25    Colorado courts approve of the admission of graphic photos only when it assists in proving a material fact. *See People v. Carrier*, 791 P.2d 1204, 1205 (Colo. App. 1990). But when graphic photos lack probative value, their admission constitutes reversible error. *Archina v. People*, 307 P.2d 1083, 1095 (Colo. 1957) (concluding that pictures of a naked body on a marble slab had no probative value).

¶ 26    A person commits the crime of first degree murder if, "[a]fter deliberation and with the intent to cause the death of a person other than himself, he causes the death of that person."

§ 18-3-102(1)(a), C.R.S. 2025.  A person commits the crime of second degree murder if, "the person knowingly causes the death of a person."  § 18-3-103(1)(a), C.R.S. 2025.

¶ 27    Under section 18-1-704(1), C.R.S. 2025, a person has the right to use force to defend himself from the use or imminent use of unlawful physical force by another person, and he may use a degree of force that he reasonably believes is necessary for that purpose. *See People v. Luna*, 2020 COA 123M, ¶ 26 ("Although the affirmative defense of self-defense takes into account the actual belief or state of mind of a defendant, it ultimately requires that a reasonable person would have believed and acted as the defendant did.").

¶ 28    When self-defense is asserted as an affirmative defense, the defendant generally admits the commission of the elements of the charged act but seeks to justify the act.  *People v. Pickering*, 276 P.3d 553, 555 (Colo. 2011).  Disproving the existence of self-defense becomes an additional element of the offense that the prosecution must disprove beyond a reasonable doubt.  § 18-1-407(2), C.R.S. 2025; *see Pickering*, 276 P.3d at 556.

## C. Analysis

¶ 29     We agree with DeRossett that the court abused its discretion in admitting at least some of the voluminous and often cumulative autopsy photographs. Indeed, we discern no reason for the many cumulative photographs of the victim's body at the morgue or the cumulative photographs of the victim's cleaned body.

¶ 30     However, we conclude reversal is not required because the photographs were highly probative of DeRossett's specific mental state — the primary issue the jury had to decide — and whether he acted in self-defense — particularly, whether stabbing the victim fifteen times constituted a reasonable response to the threat he faced. The photographs depicted the location, nature, and extent of each of the fifteen stab wounds individually as well as collectively with Jackson's other injuries. The court instructed the jury on first and second degree murder and self-defense. The jury had to decide whether DeRossett acted after deliberation and with intent or knowingly when he caused Jackson's death and whether the People had disproved his assertion of self-defense (i.e., whether DeRossett's conduct was a reasonable response to the threat he faced).

¶ 31    Additionally, we agree with the People that most of the photographs offered the jury some different information.  Some photographs are closer up, taken from different angles, and some include a measuring tool.  Moreover, the photographs of Jackson taken before her body had been cleaned, while cumulative, were not "gratuitous," as DeRossett argues, but instead show Jackson's wounds in a state more closely resembling how they appeared at the crime scene.  And each of these photographs was discussed by Dr. Holmes during her testimony.  In contrast, the photographs of Jackson's cleaned body depict the wounds in a way that was not visible prior to the cleaning and formed the basis for Dr. Holmes' opinion.  *See People v. Marquiz*, 685 P.2d 242, 248 (Colo. App. 1984), *aff'd*, 726 P.2d 1105 (Colo. 1986).

¶ 32    DeRossett's reliance on *Archina v. People*, 307 P.2d 1083 (Colo. 1957), is misplaced.  In *Archina*, the primary issue at trial was the identity of the murderer.  The Colorado Supreme Court held that it was reversible error to admit morgue photographs of the victim's naked body taken seventeen days after the shooting that showed the results of extensive surgery performed after the shooting.  In this case, identity was not an issue; instead, DeRossett's mental

14

state and his claim of self-defense were the focus. And the autopsy photographs, which were taken shortly after Jackson's death, related directly to those disputed issues. Therefore, *Archina* is distinguishable.

¶ 33 Additionally, we reject DeRossett's argument that the probative value of the photographs was low because he never disputed the cause of Jackson's death. Photographs of a victim may still have probative value even if they relate to an undisputed matter. *People v. White*, 606 P.2d 847, 849 (Colo. 1980) ("Photographs are not inadmissible solely because the defendant has stipulated to these matters, or because these matters have been established through the testimony of prosecution witnesses."); *see also Jorgenson v. People*, 482 P.2d 962, 965 (Colo. 1971) (photographs of victim at the scene and in the morgue depicting victim's injuries properly admitted even when defendant "admit[ted] to the killing, relying solely on self-defense"). But here, DeRossett's mental state and whether he acted in self-defense in stabbing the victim fifteen times were highly disputed, and the photographs were probative of those issues. Moreover, "[t]he prosecution is generally entitled to prove the elements of its case against a defendant by

15

evidence of its own choice, and a defendant 'may not stipulate or admit his way out of the full evidentiary force of the case as the [prosecution] chooses to present it.'" *People v. Morales*, 2012 COA 2, ¶ 9 (quoting *Old Chief v. United States*, 519 U.S. 172, 186-87 (1997)).

¶ 34 In the end, while we agree that the court abused its discretion by admitting an excessive number of autopsy photographs, we conclude that reversal of DeRossett's conviction is not required, because the evidence of his guilt was overwhelming. To begin, DeRossett admitted that he killed the victim. The only questions for the jury to decide were whether he did so in self-defense and what his state of mind was at the time.

¶ 35 Additionally, the evidence showed that DeRossett stabbed the victim fifteen times. Moreover, DeRossett provided inconsistent statements of how the victim sustained those wounds. Finally, the jury's conviction on the lesser included offense shows that it was not swayed by the prejudicial photographs and that it carefully considered the evidence in reaching its decision. *See Washington v. People*, 2024 CO 26, ¶ 35 (jury's verdict on lesser degree of murder indicated that error did not cause jury to blindly convict defendant).

## III. Expert Testimony

¶ 36    DeRossett next contends that a psychologist's opinion that he diagnosed DeRossett with an unspecified personality disorder — offered to rebut defense evidence that a serious brain injury affected DeRossett's mental condition at the time of the killing — did not qualify for the exception to the prosecution's bar under section 16-8-107(1)(a) and was irrelevant and unduly prejudicial. We disagree.

### A. Additional Background

¶ 37    DeRossett initially pleaded not guilty by reason of insanity (NGRI) under section 16-8-101.5(1)(b), C.R.S. 2025. DeRossett underwent a court-ordered sanity evaluation by Dr. Charles Harrison. Based on his interview with DeRossett and his review of DeRossett's medical and jail records, Dr. Harrison concluded that, at the time of the offense, DeRossett

> did not suffer from a mental disease or defect
> or from a condition of mind caused by a
> mental disease or defect that caused him to be
> incapable of distinguishing right from wrong or
> prevented him from forming the culpable
> mental state that is an essential element of the
> crimes charged.

17

¶ 38    Therefore, Dr. Harrison opined, DeRossett "was legally sane at the time of the alleged offense."

¶ 39    Subsequently, DeRossett withdrew his NGRI plea and gave notice of his intent to introduce expert witness opinions about his mental condition under section 16-8-107(3)(b).

¶ 40    In his opening statement, defense counsel discussed DeRossett's previous head injury:

> Mr. DeRossett decades ago was in a pretty awful and horrific . . . motorcycle accident. Mr. DeRossett suffered an extremely serious head injury, and still suffers from the effects of that . . . car accident.
>
> You'll hear that after that motorcycle accident in southern California when he was in his twenties, that he was ejected from . . . the motorcycle. He was hit and struck by another car.
>
> He was rushed to the Emergency Room, where he underwent emergency brain surgery . . . and then remained in the hospital for weeks and weeks. He couldn't talk. He couldn't walk. He couldn't communicate. He had lost a lot of functioning in his brain.
>
> Now, someone like that, after weeks in the hospital, can't live on their own, and so he's transitioned to a long-term care facility for rehabilitation for people with head injuries, and he spent months and months in that long-term residential care facility . . . .

. . . [W]hile he was there, he learned how to walk and talk and communicate again. And, yes, as he sits here today, he can talk, he can walk. He can communicate.

But there are lasting and lingering effects from that accident that never went away, that he never fully healed from. He still has processing issues. He still has difficulty communicating with people.

He still has difficulty controlling his own emotions and reading other people's emotions and body language. He still has . . . trouble putting together linear sentences. Still has trouble hearing, which is why the . . . interpreter is here.

You're going to see that he still has a scar. You can't see it right now, it's on the other side of his head. It spans the entire length of his head from . . . his left, front to back, from where the brain surgeon had performed brain surgery on him, and removed part of his brain.

While Mr. DeRossett was discharged from that treatment facility decades ago, he still suffers lingering effects that came into play the day that this happened.

One of those is the fact that with his head injury, his sensitivity to alcohol skyrocketed, as you might imagine. He could no longer drink like he used to, and alcohol no longer affected him like it used to.

So with that in mind, that background in mind, we get to January 1st of 2020. Mr. DeRossett was drunk, and he was smoking

19

marijuana.  Mr. DeRossett and Ms. Jackson had been fighting.

They had been living together for a few months at that point, and Mr. DeRossett was quite frankly frustrating Ms. Jackson.  He was being naggy and needy and messy, and he was drunk and he was smoking and he lost his job.

And so Ms. Jackson is at the end of her rope, and their argument turned into a physical altercation where she picked up a knife, and she came at him with it.  And Mr. DeRossett was confused.  Mr. DeRossett was slow to process.  There was no time to think, no time to reason.  Mr. DeRossett disarmed Ms. Jackson, and he defended himself until he felt safe again.

¶ 41     Twice during the cross-examination of the prosecution's witnesses, counsel elicited evidence about DeRossett's scar from the motorcycle accident.  Counsel also elicited evidence that while in the hospital following the incident, DeRossett seemed confused and had trouble uttering complete sentences.

¶ 42     DeRossett objected to the prosecution calling Dr. Harrison in rebuttal and argued that such testimony violated his rights to due process, a fair trial, confrontation, the presumption of innocence, remain silent, a fair and impartial jury, and effective assistance of counsel.  The trial court responded:

[C]ertainly there was . . . [,] in opening statements, summation of evidence with respect to Mr. DeRossett's traumatic brain injury, and the lingering effects of the brain injury on his ability to assess the situation in the process — I think the term was used about processing.

There was evidence elicited on cross-examination concerning the scar that was also referenced in opening statements that Mr. DeRossett has, as a result of brain surgery following the accident; although there hasn't been evidence concerning the brain surgery, it was referenced in opening statement.

There has been evidence elicited concerning Mr. DeRossett's presentation or demeanor at the scene of the crime, and then later at the hospital, at least for the first part.

There's been suggestion, although no evidence, at least suggestion through questions of counsel concerning medication [sic] with Adderall in order to sedate Mr. DeRossett given that he was agitated and . . . there was . . . some evidence that his statements were incoherent, at least in the hospital in the first part, which ties into the defense's notice with respect to impaired mental condition.  So there is evidence in the record at this point with respect to the issue that was introduced to the jury as part of the defense's opening.

The defense is also in possession of Dr. Harrison's report. . . .  [T]he extent to which the information would be introduced at trial has been litigated extensively before now, so it's not as if the defense is not aware of the

21

contents of the report and the scope of Dr. Harrison's opinion.

. . . .

So . . . to say that there hasn't been any evidence with respect to impaired mental condition that's been introduced to the jury I don't think its accurate.

I think that . . . there's certainly evidence that has already been introduced that is consistent with the defense's summation of evidence that would be present that goes precisely to that condition.

So . . . I am struggling here to find . . . how Dr. Harrison's conclusions with respect to the issues raised by the defense would not be proper rebuttal.

¶ 43   The prosecution replied, arguing that Dr. Harrison's testimony was admissible to rebut DeRossett's mental condition evidence under section 16-8-107(1)(a) and (1.5)(a).

¶ 44   Consistent with its prior statements, the trial court found that evidence concerning DeRossett's mental condition had been introduced and that the prosecution should have an opportunity to rebut the evidence. The trial court limited Dr. Harrison's testimony to the issues already before the jury including DeRossett's intoxication, his brain injury, and Dr. Harrison's diagnosis.

¶ 45    Dr. Harrison testified that the mental condition evaluation is "a smaller subset of a mental-state-at-the-time-of-the-alleged-offense evaluation." He defined a mental condition diagnosis as "anything from . . . a low-level situation, to something that's much more severe in nature that significantly impairs the person's functioning, their behavior, their thinking."

¶ 46    When the prosecution asked for Dr. Harrison's diagnosis of DeRossett, defense counsel renewed his previous objection, which the trial court again overruled. Dr. Harrison stated that he diagnosed DeRossett "with a severe alcohol use disorder, and an unspecified personality disorder."

> [PROSECUTION]: With regard to unspecified personality disorder, explain what that means.
>
> . . . .
>
> [DEFENSE COUNSEL]: Objection, relevance.
>
> TRIAL COURT: Overruled.
>
> DR. HARRISON: When I use the unspecified personality disorder diagnosis, what I mean by that is that I didn't have clear information that there was a single specific personality disorder that fit with the information and the — and the presentation by Mr. DeRossett.
>
> I included unspecified personality disorder because there were multiple symptoms of

23

multiple personality disorders, including narcissism, antisocial —

[DEFENSE COUNSEL]: Same objection, Judge, and previous record.

TRIAL COURT: Overruled.

DR. HARRISON: Antisocial tendencies, and what's referred to as borderline personality disorder tendencies as well.

[PROSECUTION]: With regard to those three traits, can you explain what you mean by narcissism, antisocial tendencies, and borderline traits?

. . . .

[DEFENSE COUNSEL]: Same objection.

TRIAL COURT: Overruled.

DR. HARRISON: Narcissism in — in a nutshell is a[n] inflated sense of self, inflated ego, feeling like one needs to be appreciated, special attention needs to be given to them. Antisocial functioning, antisocial personality disorder tendencies are things like disregarding the rights of others, manipulative, deceitful, those types of things. Borderline personality disorder traits include things like having impulsive responses to the fear [of] or actual rejection, vacillating quickly between moods.

. . . [T]he narcissism, antisocial, and borderline personality tendencies or the symptoms, there is some overlap between those three.

24

¶ 47    The prosecution then asked Dr. Harrison's opinion of

DeRossett's mental condition at the time of the offense.  Over

DeRossett's objection, Dr. Harrison replied:

> My opinion of his mental condition around the
> time the alleged offense [is] that . . . it was
> most likely alcohol intoxication that
> contributed to his mental condition around
> that time.
>
> Alcohol intoxication can lead to things like
> disinhibited anger, meaning anger that you
> don't inhibit, you don't stop.  Aggression.
> Mutability, which means quickly changing
> moods, happy, sad, angry, et cetera.
> Impulsivity.
>
> Those are the types of results from alcohol
> intoxication that I think were most likely
> contributing to his mental condition around
> the time of the alleged offense.

### B. Standard of Review and Applicable Law

¶ 48    As previously described, we review a trial court's evidentiary

rulings for an abuse of discretion.  *Nicholls*, ¶ 17.

¶ 49    As relevant here, section 16-8-107(1)(a) provides:

> Except as provided in this subsection (1),
> evidence acquired directly or indirectly for the
> first time from a communication derived from
> the defendant's mental processes during the
> course of a court-ordered examination
> pursuant to section 16-8-106[, C.R.S. 2025,]
> or acquired pursuant to section 16-8-103.6[,
> C.R.S. 2025,] is not admissible against the

25

defendant on the issues raised by a plea of not guilty, if the defendant is put to trial on those issues, except to rebut evidence of the defendant's mental condition introduced by the defendant to show incapacity to form a culpable mental state; and, in such case, that evidence may be considered by the trier of fact only as bearing upon the question of capacity to form a culpable mental state, and the jury, at the request of either party, must be so instructed.

¶ 50    Section 16-8-107(1.5)(a) provides:

Except as otherwise provided in this subsection (1.5), evidence acquired directly or indirectly for the first time from a communication derived from the defendant's mental processes during the course of a court-ordered examination pursuant to section 16-8-106 or acquired pursuant to section 16-8-103.6 is admissible only as to the issues raised by the defendant's plea of [NGRI], and the jury, at the request of either party, must be so instructed; except that, for offenses committed on or after July 1, 1999, the evidence is also admissible as to the defendant's mental condition if the defendant undergoes the examination because the defendant has given notice pursuant to subsection (3) of this section that the defendant intends to introduce expert opinion evidence concerning the defendant's mental condition.

¶ 51    Finally, section 16-8-107(3)(b) provides:

Regardless of whether a defendant enters a plea of [NGRI] pursuant to section 16-8-103,

[C.R.S. 2025,] the defendant is not permitted to introduce evidence in the nature of expert opinion concerning the defendant's mental condition without having first given notice to the court and the prosecution of the defendant's intent to introduce the evidence and without having undergone a court-ordered examination pursuant to section 16-8-106. A defendant who places the defendant's mental condition at issue by giving such notice waives any claim of confidentiality or privilege as provided in section 16-8-103.6. The notice must be given at the time of arraignment; except that the court, for good cause shown, shall permit the defendant to inform the court and prosecution of the intent to introduce such evidence at any time prior to trial.

## C. Analysis

¶ 52     We agree with the People that, despite the prosecutor's citation to it at trial, section 16-8-107(1)(a) is not applicable in this case. Section 16-8-107(1)(a) governs the admissibility of evidence acquired during the course of a court-ordered examination and limits such evidence to the defendant's capacity to form a culpable mental state. Here, DeRossett initially pleaded NGRI but later withdrew that plea and proceeded with a mental condition defense. At trial, he did not contend that he lacked the capacity to form the requisite mental state. Therefore, subsection (1)(a) does not apply. *See People v. Herdman,* 2012 COA 89, ¶ 27 ("[The defendant]

27

withdrew his plea of [NGRI, and] [a]ccordingly, section 16-8-107(1)(a), . . . triggered by claims of insanity, as currently defined, do[es] not apply.").

¶ 53 Because DeRossett withdrew his NGRI plea, this case pertains to the broader "mental condition" described in section 16-8-107(3)(b) and permitted by section 16-8-107(1.5)(a). *See People v. Flippo*, 159 P.3d 100, 104 (Colo. 2007) (section 16-8-107(3)(b) is "meant to apply in those situations where insanity is not the reason the evidence is being introduced").

¶ 54 Under sections 16-8-107(1.5)(a) and 16-8-107(3)(b), Dr. Harrison's testimony was properly admitted to rebut the mental condition evidence introduced by DeRossett related to his previous brain injury. DeRossett's counsel articulated the defense's theory of the case in his opening statement by describing the motorcycle accident and the resulting injuries' lingering effects, including processing issues, difficulty communicating, and difficulty processing his own and other people's emotions. During the cross-examination of multiple prosecution witnesses, counsel referenced DeRossett's scar from the accident and elicited evidence that DeRossett seemed confused in early interactions with police.

Dr. Harrison's rebuttal testimony provided an alternate explanation for DeRossett's mental state at the time of and immediately following the offense. Therefore, Dr. Harrison's mental condition diagnosis directly rebutted DeRossett's brain injury evidence. *See Herdman*, ¶ 49 ("[E]vidence of Herdman's psychopathy was relevant to rebut his contention that his conduct was due to involuntary intoxication, because such evidence offered an alternative explanation for his conduct.").

¶ 55     Additionally, we are not persuaded that the prosecution was precluded from calling Dr. Harrison simply because the defense did not call an expert witness first. As DeRossett concedes, he provided notice of his intent to introduce expert witness opinion testimony about his mental condition under subsection (3)(b) — a precondition to the prosecution's ability to introduce evidence under subsection (1.5)(a). His later decision to present the mental condition evidence through lay witness testimony, as permitted by section 16-8-109, C.R.S. 2025, did not preclude the prosecution from rebutting that lay testimony with expert testimony, and he provides no legal authority that would support such a conclusion.

¶ 56     We are similarly unpersuaded that the *Herdman* case requires a different result simply because it involved evidence rebutting an *affirmative defense* (involuntary intoxication) rather than a traverse (voluntary intoxication).  DeRossett does not explain why that difference produces a different outcome, so we do not address the issue further.  *See People v. Cuellar*, 2023 COA 20, ¶ 44 (we do not address undeveloped arguments).

¶ 57     We disagree with DeRossett's contention that Dr. Harrison's testimony was irrelevant because his diagnosis was that DeRossett's mental condition at the time of the homicide was affected by alcohol intoxication and was not "in any way affected by negative personality traits."  Dr. Harrison testified that the mental condition evaluation was a subset of the "mental-state-at-the-time-of-the-alleged-offense" evaluation and said a mental condition diagnosis ranged from interfering with a person's functioning to significantly impairing a person's functioning.  *Cf. Herdman*, ¶ 59 (concluding admission of bond examiner's testimony was error when his assessment was not designed to analyze the defendant's mental state at the time of the offense).  Indeed, Dr. Harrison opined that DeRossett's mental condition was affected by alcohol

intoxication, disinhibited anger, aggression, mutability, and impulsivity. Moreover, DeRossett gave the 911 operator and the police inconsistent accounts of what had occurred and what he remembered, which is indicative of both alcohol intoxication and the deceit and manipulation traits of unspecified personality disorder.

¶ 58     Merely because Dr. Harrison opined that DeRossett's mental condition was affected by alcohol consumption does not negate his mental condition diagnosis. To the extent that DeRossett argues that the mental condition diagnosis did not exist or affect his mental condition at the time of Jackson's death, there was evidence contradicting this assertion, and it was for the jury to decide the conflicting evidence before it. *See People v. Jaramillo*, 183 P.3d 665, 670 (Colo. App. 2008) (in a criminal case it is the fact finder's job to resolve disputes in evidence).

¶ 59     We are not persuaded otherwise by DeRossett's reliance on *State v. Miner*, 657 S.W.2d 332, 333 (Mo. Ct. App. 1983). In *Miner*, the Missouri Court of Appeals held that the trial court erroneously admitted the prosecution's rebuttal testimony that the defendant suffered from antisocial personality disorder because it was not

relevant to *whether* the defendant was intoxicated. Here, there was no dispute that DeRossett was intoxicated. Therefore, *Miner* is distinguishable.

¶ 60 Finally, we conclude that the probative value of the rebuttal evidence was not outweighed by the danger of unfair prejudice because Dr. Harrison's opinion confirmed DeRossett's defense theory that he was intoxicated and that his intoxication was the primary driver of DeRossett's mental state at the time of the offense. Moreover, the fact that Dr. Harrison could not definitively diagnose DeRossett with a specific personality disorder shows that any disorder's existence was less than well established. And the fact that the jury convicted DeRossett of the lesser included offense of second degree murder shows that it carefully considered the mental condition evidence. *See Martin v. People*, 738 P.2d 789, 795-796 (Colo. 1987).

¶ 61 Accordingly, we discern no abuse of discretion in the admission of this evidence.

¶ 62    DeRossett next contends that the trial court erred by not giving a limiting instruction regarding Dr. Harrison's mental condition evidence.  Again, we disagree.

A. Additional Background

¶ 63    DeRossett tendered the following jury instruction:

> You may consider evidence of Mr. DeRossett's mental health condition, or mental condition at the time of the commission of the offense in conjunction with the evidence of intoxication in determining whether or not the elements of 'after deliberation and with intent', 'knowingly', 'recklessly', and 'with criminal negligence' have been proven to your individual satisfaction beyond a reasonable doubt.
>
> Additionally, you may consider Mr. DeRossett's mental health condition, or mental condition as it relates to self-defense.

¶ 64    The prosecutor objected to the instruction, arguing,

> [T]o me this reads inaccurate as the intoxication — the jury's instruction you may not consider evidence of self-induced intoxication for the purposes of deciding whether the prosecution has proved the elements of murder in the second degree, manslaughter, or criminally negligent homicide.  So to me this reads as inaccurate, when going through those mental states.
>
> It improperly highlights certain evidence.  The defenses and COLJI provide[] certain

33

instructions as it goes to intoxication and self-defense. NGRI was not pled here, so there's no instruction in that regard. And I do believe that it is confusing.

¶ 65 The trial court rejected the proposed instruction, stating that it "confuse[d] and conflate[d] . . . the separate and distinct purposes for which the evidence [wa]s admissible."

¶ 66 After defense counsel amended the instruction, he argued,

[T]here are two separate defenses that I've tried to parse out in the supplemental instruction that I sent to your clerk and the prosecution, and what I do in this second attempt is identify mental health or mental condition evidence, and the fact that the jury can consider that in determining whether or not the — the mens rea elements have been met or proven to their satisfaction.

¶ 67 Again, the prosecution objected. The trial court rejected the amended instruction.[2]

## B. Standard of Review and Applicable Law

¶ 68 A trial court has a duty to properly instruct the jury on the applicable law. *People v. Jones*, 2018 COA 112, ¶ 24. We review de novo whether the trial court's instructions, when read as a whole,

---

[2] The amended instruction is not in the record on appeal, so our review is limited to defense counsel's proffered explanation of the instruction.

34

correctly instructed the jury on the controlling law. *Tibbels v. People*, 2022 CO 1, ¶ 22. But we review "a trial court's decision to give, or not to give, a particular jury instruction for an abuse of discretion." *People v. Payne*, 2019 COA 167, ¶ 16.

¶ 69 "Statutory interpretation is a question of law we review de novo." *A.S. v. People*, 2013 CO 63, ¶ 10. When interpreting a statute, our primary purpose is to ascertain and give effect to the intent of the legislature. *People v. Market*, 2020 COA 90, ¶ 16. We assume that the intent of the legislature "has been expressed in the chosen language." *People v. Coleman*, 2018 COA 67, ¶ 41. We look first to the statute's language and seek "to give its words and phrases their plain and ordinary meanings." *Market*, ¶ 16. Statutory words and phrases are read in context and construed "according to the rules of grammar and common usage." *McCoy v. People*, 2019 CO 44, ¶ 37. "We must construe the statute so as to give effect to every word, and we may not adopt a construction that renders any term superfluous or meaningless." *People v. Rice*, 2015 COA 168, ¶ 12. If the statute is clear and unambiguous, we look no further and apply the statute as written. *People v. Sullivan*, 53 P.3d 1181, 1182 (Colo. App. 2002).

¶ 70 Section 16-8-107(1)(a), relied on by DeRossett, requires the court to instruct the jury, "at the request of either party," that evidence from the court-ordered sanity evaluation "may be considered by the trier of fact only as bearing upon the question of capacity to form a culpable mental state."  But subsection (1.5)(a), applicable to a mental condition defense, contains no such requirement.

## C. Analysis

¶ 71 In examining the plain language of the statute, we conclude that section 16-8-107(1)(a) applies only when a defendant has entered a plea of NGRI and evidence from a court-ordered examination is introduced at trial.  The record here shows that DeRossett withdrew his NGRI defense before trial.  Thus, his reliance on subsection (1)(a) is misplaced.  Instead, subsections (1.5)(a) and (3)(b), which govern mental condition evidence, do not require the court to provide a limiting instruction.

¶ 72 Moreover, DeRossett's proposed instruction did not address the jury's use of evidence from the court-ordered evaluation and did not seek to limit consideration of that evidence to his mental condition.  Instead, DeRossett endeavored to inform the jury that it

36

could use the mental condition evidence presented, along with evidence of his intoxication, to determine the mens rea for all levels of homicide and self-defense.

¶ 73    Moreover, DeRossett's tendered instruction did not comport with the law because, as the prosecution argued, it would have permitted the jury to consider self-induced intoxication as a defense to the knowingly mental state element of second degree murder. *See People v. Stone*, 2020 COA 23, ¶ 5 (evidence of self-induced intoxication is not admissible to negate the culpability element of knowingly); *see also People v. Gonzales-Quevedo*, 203 P.3d 609, 612 (Colo. App. 2008) (we can affirm on any basis supported by the record).

¶ 74    Further, we are not convinced that CRE 105, which directs courts to provide a limiting instruction upon request, requires a different result. DeRossett never raised CRE 105 or argued it as a basis for his request, so the court never considered it. Instead, the court exercised its discretion to reject two proposed instructions that did not comport with the law. And because they were not theory of the defense instructions, the court was under no

obligation to assist counsel in formulating an appropriate instruction.

¶ 75 Finally, even assuming the court erred, we conclude that any error was harmless because DeRossett admitted killing the victim, and, despite the absence of a limiting instruction, the jury convicted him of the lesser included offense.

## V. Cumulative Error

¶ 76 The cumulative error doctrine applies when "the cumulative effect of [multiple] errors and defects substantially affected the fairness of the trial proceedings and the integrity of the fact-finding process." *Howard-Walker v. People*, 2019 CO 69, ¶ 24 (quoting *People v. Lucero*, 615 P.2d 660, 666 (Colo. 1980)).

¶ 77 Because we have identified only one error, we conclude no cumulative error occurred.

## VI. Disposition

¶ 78 The judgment is affirmed.

JUDGE BROWN and JUDGE SCHUTZ concur.